**FIRST NATIONWIDE BANK,
et al., Plaintiffs,**

v.

The **UNITED STATES,** Defendant.

No. 96–590C.

United States Court of Federal Claims.

July 6, 2001.

Harry M. Reasoner, Houston, Texas, for plaintiffs. Thomas P. Marinis, Jr., John D. Taurman, John M. Faust, and Gary L. Leshko, of counsel.

Scott D. Austin, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, for defendant. With him on the briefs were Stuart E. Schiffer, Acting Assistant Attorney General, David M. Cohen, Director, and Jeanne E. Davidson, Deputy Director. Paul G. Freeborne, Glenn I. Chernigoff, and Jeffery T. Infelise, of counsel.

*OPINION*

BRUGGINK, Judge.

Pending in this *Winstar*-related[1] case are the parties' cross-motions for summary judg-

ment. Oral argument was held on June 29, 2001.[2] For the reasons set forth below and in our opinion in *Centex Corp. v. United States*, 49 Fed.Cl. 691 (2001), plaintiffs' motion for summary judgment is granted in part and denied in part, and defendant's motion for summary judgment is granted in part and denied in part.

## BACKGROUND[3]

This case, like *Centex*, is one of the five pending "tax benefit" cases. Like the plaintiffs in *Centex*, plaintiffs here, First Nationwide Bank, First Gibraltar Holdings, Inc., and MacAndrews & Forbes Holdings, Inc., (collectively "MacAndrews") entered into an assistance agreement ("Assistance Agreement") with the Federal Savings and Loan Insurance Corporation ("FSLIC") and the Federal Home Loan Bank Board ("FHLBB") in December 1988 in connection with plaintiffs' acquisition of several failing thrifts[4] marketed by the FSLIC and the FHLBB as part of the FSLIC and FHLBB's Southwest Plan.

■ The statutory backdrop to this transaction is identical to that of *Centex*. Accordingly, our discussion in *Centex Corp. v. United States*, 48 Fed.Cl. 625 (2001), of the FSLIC-specific provisions of the Internal Revenue Code as it existed in 1988 is fully

applicable here, and we hereby adopt our holding in *Centex*, 48 Fed.Cl. 625, that a deduction for covered asset losses was available under the Internal Revenue Code at the time of the transaction here.[5]

Also like the assistance agreement in *Centex*, the Assistance Agreement here was, in part, built on the assumption of a deduction for covered asset losses.[6] The precise terms of the agreement, however, were somewhat different from that of the Centex transaction. To understand this difference, we quote an additional paragraph from the Tax Benefits section of the Request for Proposals[7] issued by the FSLIC in relation to the Southwest Plan:

12. The[ ] [FSLIC-specific] provisions [of the Internal Revenue Code] were intended to aid the FSLIC by reducing the amount of FSLIC assistance that should be required by an acquiring institution for a particular cost, expense or loss by the amount of the tax benefit obtained by the acquiring institution with respect to such cost, expense or loss. This reduction in required assistance can be realized by the FSLIC in one of two ways: (1) Assistance amounts to be paid by FSLIC to the acquiring institution can be reduced by the amount of the tax benefit available to the acquiring institution with respect to the item for

1. *United States v. Winstar Corp.*, 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996).

2. Glenn Chernigoff argued for the Government. Oral argument in this case was held in conjunction with oral argument in *Centex Corp. v. United States*, No. 96–494C, and *First Heights Bank, FSB v. United States*, No. 96–811C, because the three cases presented several of the same issues.

3. The relevant facts are undisputed, making the issues presented here appropriate for summary judgment. We also refer the reader to today's opinion in *Centex* for background regarding Congress's activities that are matters of public record.

4. The package of thrifts acquired by plaintiffs here was known as the PEAR I package.

5. Although raised here by defendant, it is unnecessary for us to address two other questions we considered in *Centex*, 48 Fed.Cl. 625. Those

questions were (1) whether the Assistance Agreement, within its four corners, contained a promise that a deduction for covered asset losses would continue to exist and (2) whether such a promise would have been authorized. At oral argument, plaintiffs' counsel conceded that the Assistance Agreement did not contain a promise of a continuing deduction and that, if it had, the promise would not have been authorized. Tr. at 122.

6. With certain additions and exceptions not relevant here, the Assistance Agreement defined covered assets as "[a]ll assets acquired by the ACQUIRING ASSOCIATION pursuant to the Acquisition Agreements." A covered asset loss was defined as "the amount by which the Book Value of a Covered Asset exceeds the Net Proceeds Received by the Acquiring Association upon the Liquidation of such Covered Asset."

7. This is the same Request for Proposals that the *Centex* plaintiffs received.

which assistance is being paid. For example, if capital loss or undisclosed liability coverage is requested, and the combined marginal federal and state income tax rate is 40%, FSLIC can pay 60% of any loss or liability incurred and the acquiring institution can recover the remaining 40% of the loss or liability through a deduction of the loss or liability on its tax returns. (2) Assistance amounts can be paid in full by FSLIC to the acquiring institution and the acquiring institution can return to FSLIC the allocable tax benefit when it is realized by the filing of income tax returns. Thus, under this method in the above example, FSLIC will pay 100% of the loss or liability and the acquiring institution will pay the tax benefit to FSLIC when the tax returns recognizing such benefit are filed. In taking account of tax benefits, FSLIC prefers to use method (1) but will consider (2).

The Centex transaction utilized the second method outlined in this paragraph from the Request for Proposals. The MacAndrews transaction, plaintiffs contend, utilized the first method. Under this first method, an acquirer obligated itself to accept a reduced amount of assistance as the mechanism for sharing the benefits derived from the covered asset loss deduction.

MacAndrews and the FSLIC negotiated over the proper ratio for splitting the tax benefits. In a term sheet submitted on November 29, 1988, MacAndrews proposed:

During the term of the assistance agreement FSLIC shall receive an amount equal to 25% of the tax benefits available for use by Acquirer, whether or not realized, based upon an assumed tax rate of 22%. Aggregate payments will be at least $300 million over the term of the assistance agreement, with annual payments of at least $30 million, subject to a carry-forward of any excess over $30 million.

A December 2, 1988, revised term sheet increased the FSLIC's share of tax benefits by increasing the assumed tax rate to 30 percent, so that the FSLIC would receive 7.5

percent of the tax benefit item. The cover letter for this revised term sheet stated:

The provision provides certainty with respect to the receipt by the FSLIC of substantial tax benefits in two material ways. We have provided that the FSLIC will receive 25% of the tax benefits available for use by the Acquirer, whether utilized by the Acquirer or not. To provide still further assurance, we have committed to payments to the FSLIC amounting to an aggregate amount of no less than $300 million, with guaranteed annual payments of at least $30 million.

On December 9, 1988, MacAndrews submitted its final revisions to its term sheet. This final bid "increase[d] the FSLIC's sharing of the tax benefits of the transaction" by amending the term sheet to provide that the FSLIC would receive "an amount equal to 33 ⅓% of the tax benefits available for use by Acquirer, whether or not realized, based upon an assumed tax rate of 30%." The final bid maintained the $300 million guaranteed minimum to the FSLIC.

MacAndrews's final bid was accepted by the Bank Board on December 12, 1988, and drafting of the Assistance Agreement began shortly thereafter. On December 27, 1988, the Bank Board met to consider the FSLIC's recommendation that the Bank Board approve MacAndrews's acquisition of the PEAR I package. The FSLIC's Recommendation Memorandum attached as an exhibit the assistance agreement recommended for approval. The Recommendation Memorandum stated:

All tax benefits resulting from the transaction will be shared 70.6% to the acquirer and 29.4% (based on a 34% tax rate) to the FSLIC, whether or not utilized by the acquirer and subject to an annual minimum of $30 million per year.

. . . .

FSLIC guaranteed to receive ⅓ of the tax benefits by making its assistance payments on an after-tax basis, but assuming that the maximum federal income tax rate equals 30%. Declines in the federal tax rate below 30% would improve the position FSLIC would have had under an arrangement tied to actual tax rates. At present,

however, the effect of the provision is that the Acquirer retains 70.6% of the present maximum 34% federal tax rate and 100% of any benefits from increases in tax rates. FSLIC is guaranteed to receive at least $30 million of tax benefits in each year of the 10 year agreement for a cumulative total of $300 million.

At the December 27 Bank Board meeting, an economic analysis of the transaction prepared by Blackstone Financial Management ("Blackstone") was discussed. The Bank Board was told that, even when considering consolidated costs to the United States Treasury, "resolution is still ... superior to liquidation." [8] The Bank Board approved MacAndrews's acquisition of the PEAR I package.

Also on December 27, the Internal Revenue Service issued a private letter ruling requested by MacAndrews. This ruling confirmed that the transaction constituted a "reorganization within the meaning of section 368(a)(10)(G) and 368(a)(3)(D)" and that the "basis of the assets received by [MacAndrews] will be the same as the basis of those assets in the hands of the [acquired institution] immediately prior to the transfer."

Having approved the acquisition, the Bank Board issued a press release on December 28, 1988. This press release stated: "FSLIC will receive ... 33 percent of all tax benefits whether or not utilized and the acquirer is guaranteeing aggregate payments of $300 million in annual installments of not less than $30 million." [9]

On December 28, plaintiffs and the FSLIC also executed the various contracts needed to implement the transaction. These contracts included the Assistance Agreement at issue here. Section 3(a) of the Assistance Agreement listed sixteen items plaintiffs could debit to an account called "Special Reserve Account I", and § 3(c) listed four additional items plaintiffs could debit to "Special Reserve Account II." The FSLIC would then reimburse plaintiffs for these debited amounts. Of the twenty items, five called for debiting of an "After–Tax Amount:" "Capital Losses on Covered Assets," "Indemnifications," "Related Claims Expenses," "Guaranteed Yield Amount," and "Actual Loss" on covered asset yields. The term After–Tax Amount was defined as follows: "With respect to any item the After–Tax Amount of which may be debited or credited to a Special Reserve Account or paid by or to the CORPORATION, After–Tax Amount shall be equal to the product of the amount of the item and a decimal fraction equal to one minus the Tax Rate. For purposes of this computation, the Tax Rate shall be 10%." The Assistance Agreement also established "Special Reserve Account III." In this account, plaintiffs were allowed to debit in their favor the quarterly difference between the "full amount" of items and their "after-tax" amounts. Once a year, the sum of the differences was to be compared to a "Guaranteed Annual $30 Million Tax Benefit." Any shortfall in comparison to the guaranteed benefit produced a credit to the FSLIC under § 3(d).

With the Assistance Agreement in place and with the issuance of the private letter ruling from the Internal Revenue Service, plaintiffs here, like the plaintiffs in *Centex*, were in position to take advantage of the tax

---

8. A revision of this analysis was submitted to the Bank Board in written form on December 28. Blackstone's evaluation stated:

> Blackstone's [initial] assignment was to evaluate and negotiate proposals based on the cost to the FSLIC and not on the consolidated cost to the U.S. Treasury (i.e. FSLIC assistance plus foregone tax revenues). However, in consideration of potentially evolving FHLBB policy in this area, Blackstone has presented an analysis of such estimated cost assuming full utilization of tax benefits by each acquirer.

Blackstone's analysis indicated that the total consolidated cost to the Treasury of the MacAndrews proposal was $6.535 billion and that the total

consolidated cost of liquidation was $6.822 billion. These calculations included the "utilization of tax benefits by the acquirer net of tax benefit sharing with the FSLIC" and "assumed the full utilization of tax benefits."

9. Responding to this proposed finding, defendant states, "The press release fails to state that the Assistance Agreement requires 90 percent assistance payments, and does not even purport to analyze how the Assistance Agreement operates in the event that there is a change or clarification of the law as to the availability of a covered asset loss deduction." This is non-responsive. Defendant does not dispute that the press release contained the language we have quoted.

benefits, including the deduction for covered asset losses, available under the Internal Revenue Code. Furthermore, plaintiffs expected to be able to take advantage of the covered asset loss deduction.[10]

Unlike the plaintiffs' proposed findings in *Centex*, plaintiffs' proposed findings here do not address the actions taken by the FSLIC, the FHLBB, and their successor agencies in the aftermath of the tax benefit deals. However, the legislative reaction to the tax benefit deals, discussed in great detail in today's opinion in *Centex*, is relevant here and is a matter of public record. Accordingly, we refer the reader to that opinion for a discussion of Congress's actions from January 1989 to August 1993 when the Guarini legislation, which eliminated the covered asset loss deduction, was enacted.

## DISCUSSION [11]

### I. Breach of Contract

■ The issues presented here are almost identical to those considered in today's opinion in *Centex*. As we have noted, however, this Assistance Agreement did not expressly refer to the sharing of tax benefits derived from the covered asset loss deduction upon realization of those benefits. Thus, we must address the question of whether the benefits derived from the covered asset loss deduction constituted a benefit of the parties' bargain.

Defendant argues that the Assistance Agreement, by its express terms, provided for only ninety percent reimbursement for covered asset losses and that the agreement, as we have found, did not contain a term providing for full reimbursement in the event

that the deduction was eliminated, *see First Nationwide Bank v. United States*, 48 Fed. Cl. 248 (2000). This is true, but the Assistance Agreement does not read, "The FSLIC shall provide ninety percent reimbursement for covered asset losses." Rather, the Assistance Agreement provides for the payment of the "After–Tax Amount." Defendant argues that this term is defined in the Assistance Agreement and is, consequently, unambiguous: "the product of the amount of the item and a decimal fraction equal to one minus the Tax Rate." The Tax Rate was defined as ten percent so, in effect, the After–Tax Amount was ninety percent. However, defendant's argument does not explain why the parties used the term "After–Tax Amount." If defendant is correct, the figure ninety percent could have been used without reference to an "After–Tax Amount." Why was it included?

The answer is not self-evident within the four corners of the agreement. When we turn to the parties' negotiations, however, the reason is clear.[12] The term sheet and the FSLIC's Recommendation Memorandum were plainly premised on the first tax-benefit option contained in the Request for Proposals. This first option provided for a reduction in covered asset reimbursement as the mechanism for FSLIC to reap its share of the tax benefits derived from plaintiffs' disposition of covered assets. In fact, according to the Request for Proposals, this was the FSLIC's preferred method of sharing the tax benefits.

There can be no question that the parties used the term "After–Tax Amount" because they understood that the reduction in assistance payments was the mechanism by which

10. Responding to this proposed finding, defendant states, "[D]efendant disputes that any belief plaintiffs had concerning the deductibility of covered asset losses came from sources other than their own expertise and counsel." This is non-responsive and does not identify a genuine issue.

11. Furthermore, because we find a breach of the implied covenant of good faith and fair dealing giving rise to contractual liability, we need not consider plaintiffs' theory based on *Wood v. Lovett*, 313 U.S. 362, 61 S.Ct. 983, 85 L.Ed. 1404 (1941), or plaintiffs' theory based on the Assistance Agreement's cooperation clause.

12. Consideration of these negotiations does not violate the parol evidence rule:

... [M]eaning can usually be given to a writing only on consideration of all the circumstances, including the prior negotiations between the parties. The parol evidence rule is ... no bar to the use of ... statements of the parties during negotiations, in aid of the interpretation of ambiguous or uncertain clauses in written agreements. Expressions of the parties during negotiations for the contract are thus a frequent source for interpretation of its text.

*Sylvania Elec. Prods., Inc. v. United States*, 198 Ct.Cl. 106, 458 F.2d 994, 1005 (1972) (citations omitted).

the tax benefits derived from the covered asset loss deduction would be shared. This mechanism and all of the contract terms concerning the debiting and crediting of covered asset losses and guaranteed tax benefits rested on the parties' mutual assumption of a deduction for covered asset losses; these provisions were predicated on the existence of this deduction. Consequently, as we state in today's opinion in *Centex*, absent the implied good faith obligation not to target the deduction for elimination and, thereby, target one of the benefits plaintiffs received because of the contract, the contract's terms no longer hold together. The benefits derived from the covered asset loss deduction constituted a fruit of plaintiffs' contract with the FSLIC and, therefore, were protected by the implied covenant of good faith and fair dealing.

We have addressed the remainder of defendant's arguments against a finding of breach of the implied covenant of good faith and fair dealing in today's opinion in *Centex*. For the same reasons as expressed there, we find here that defendant breached the implied covenant of good faith and fair dealing when it enacted the Guarini legislation in August 1993.

### II. Fifth Amendment Takings

Plaintiffs' Fifth Amendment Takings Clause claim was pled in the alternative. Consequently, because we have found a breach of contract, plaintiffs' takings claim is dismissed as moot.[13]

### CONCLUSION

Plaintiffs' motion for summary judgment is granted in part and denied in part. Defendant's motion for summary judgment is granted in part and denied in part. On or before August 3, 2001, the parties shall file a joint proposed schedule for resolving remaining issues.

---

**13.** In any event, plaintiffs' takings claim is "conceptually foreclosed," *Plaintiffs in Winstar–Related Cases v. United States*, 37 Fed.Cl. 174, 187 n. 9 (1997), *aff'd sub nom., Ariadne Fin. Servs. Pty. Ltd. v. United States*, 133 F.3d 874 (Fed.Cir. 1998), by our finding of contract breach.