NATIONAL AUSTRALIA
BANK, Plaintiff,

v.

The UNITED STATES, Defendant.

No. 99–690C.

United States Court of Federal Claims.

March 25, 2003.

Paul Martin Wolff, Ryan T. Scarborough, and Willis N. Sautter, Washington, D.C., for plaintiff.

Brian L. Owsley and Jeanne E. Davidson, U.S. Department of Justice, Civil Division, Commercial Litigation Branch, for defendant. With them on the briefs were Scott D. Austin, Glenn I. Chernigoff, Paul G. Freebourne, Jeffery T. Infelise, Brian A. Mizoguchi.

## OPINION

BRUGGINK, Judge.

Pending in this *Winstar*-related [1] tax benefit case are plaintiff's motion for partial summary judgment and defendant's cross-motion

---

1. *United States v. Winstar Corp.,* 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996).

for summary judgment and motion to dismiss. Oral argument is deemed unnecessary. For the reasons set forth below, plaintiff's motion is granted in part and denied in part. Defendant's motion for summary judgment and motion to dismiss is granted in part and denied in part.

## FACTS [2]

During the savings and loan crisis of the late 1980s, the Federal Home Loan Bank Board ("FHLBB") and the Federal Savings & Loan Insurance Corporation ("FSLIC") were assisting healthy thrifts taking over failing thrifts. These transactions have spawned a host of litigation, much of which is analogous to the case before us now. The facts in this case are materially indistinguishable from those tax benefit cases already decided in *Local America Bank of Tulsa v. United States*, 52 Fed.Cl. 184 (2002), *Centex Corp. v. United States*, 49 Fed.Cl. 691 (2001) ("*Centex II*"), and *First Nationwide v. United States*, 49 Fed.Cl. 750 (2001). Under FSLIC-specific provisions existing in the Internal Revenue Code ("IRC") at that time, FSLIC's reimbursement of covered asset losses was not included in gross income. There is no meaningful distinction between the facts of *Local America Bank*, *Centex*, and *First Nationwide* and the case before us now. Therefore, as in those cases, we adopt our holding in *Centex Corp. v. United States*, 48 Fed.Cl. 625, 633 (2001) ("*Centex I*") that a deduction for covered asset losses was available at the time of the Assistance Agreement under the IRC.[3]

Michigan National Corporation ("MNC") entered into an assistance agreement ("Assistance Agreement") with FSLIC to acquire the failing thrift Beverly Hills Savings & Loan ("Beverly Hills") on December 31, 1988.[4] As in the above referenced cases, plaintiff claims that the enactment of § 13224 of the Omnibus Budget Reconciliation Act of 1993, Pub.L. No. 103–66, 107 Stat. 312 (1993) ("Guarini legislation") effected a breach of contract by eliminating the deduction for covered asset losses.

In the late 1980s, representatives of FHLBB and FSLIC repeatedly explained to Congress that tax benefits for potential acquirers of unhealthy thrifts were essential. FHLBB and FSLIC considered these tax benefits to be additional assets which could be used to attract potential acquirers for troubled thrifts.[5] *See Hearing Before the Subcomm. on Taxation and Debt Management of the Senate Comm. on Fin.*, 100th Cong., 2d Sess. 15 (1988) (statement of Lawrence J. White); *Carryover of Net Operating Losses and other Tax Attributes of Corporations: Hearing Before the House Committee on Ways and Means*, 99th Cong. 1st Sess. 174 (1985); Letter from FHLBB Chairman M. Danny Wall to Senator Benson (Nov. 13,

---

**2.** As will become apparent below, defendant's responses to plaintiff's proposed findings of fact are virtually useless to the court. By not directly addressing the precise facts alleged they add confusion and little light, and interfere with the intended use of Rule 56.

**3.** Throughout its response to plaintiff's findings of fact, defendant disputes that the covered asset loss deduction was available to plaintiff. Defendant does not explain why plaintiff is mistaken in asserting that this case is factually identical to *Centex* and *First Nationwide*. Because defendant does not meaningfully distinguish the facts of those two cases, we adopt our holding in *Centex I* here.

**4.** Defendant disputes that Beverly Hills was insolvent at the time it was placed in receivership. It does not, however, dispute that the accumulated deficit of Beverly Hills in April of 1985 was $391,512,000. Nor does defendant dispute that the association continued to bleed money after it

was placed into receivership, accumulating a GAAP deficit of over $500 million by the end of 1985. Defendant fails, therefore, to identify a dispute over a material issue of fact with respect to the financial standing of Beverly Hills in 1985.

**5.** Defendant disputes this statement on the grounds that neither FHLBB nor FSLIC "had authority to speak on behalf of the Government on the subject of the allowability of the covered asset loss deduction." This statement is nonresponsive to the relevant finding of fact proposed by plaintiff. Plaintiff does not claim that the entities had the authority to bind the government to particular tax treatment. Defendant also puts forward testimony by Mr. Steven Glickstein, attorney at the corporate tax division of the IRS, that IRS policy is established by regulation and no ruling had been issued on the covered asset loss issue. This testimony is also nonresponsive. Plaintiff does not claim that any regulation or ruling had been issued. Defendant fails to identify a disputed issue of material fact.

1987); Letter from FHLBB Members to Senator Garn (Feb. 14, 1986). One of these benefits was the ability to deduct covered asset losses. *Centex II*, 49 Fed.Cl. at 693.

As representatives of FSLIC and FHLBB were touting tax benefits to Congress, Bobby L. Hughes, Assistant Director for the Financial Assistance Division of FSLIC wrote to Karl Hoyle, Executive Director for Public Affairs, that "[a]cquirers realize tax benefits from assistance and built-in losses because of the ability to deduct items of assistance and/or losses incurred on disposition of assets in determining taxable income, but the amount of reimbursement from FSLIC is not included in determining such taxable income." Mem. from Bobby L. Hughes to Karl T. Hoyle 42 (Oct. 31, 1988) (emphasis removed).

In 1988, MNC was actively trying to expand. Robert Mylod, Chairman and CEO of MNC, had been a board member of Pulte Homes Corporation, which had completed an a FLSIC-assisted transaction earlier in 1988. Mr. Mylod considered an assisted transaction as a means for expanding MNC. In April of 1985, Beverly Hills was placed in receivership by FSLIC. FSLIC held a bid conference for potential acquirers of Beverly Hills on June 19, 1986. Neither the conference nor the subsequent formal bidding process generated any interest in Beverly Hills.[6] In connection with this and other anticipated acquisitions, FSLIC produced materials for potential acquirers entitled "Information and Instructions for the Preparation and Submission of Proposals." This information described potential tax benefits, including deductions for covered asset losses.[7]

After seeing no interest in a takeover of Beverly Hills, FSLIC restructured its marketing package. The revised Request for Proposal stated, under the heading of net operating losses, that the acquirer could expect to receive:

> Approximately $700 million in Net Operating Loss (NOL) Carryforwards. The FSLIC is willing to work with an investor to assist in structuring an organization which will be able to take maximum advantage of [net operating losses]. Investors should bear in mind that this IRS provision is currently planned to terminate on December 31, 1988 meaning that utilization of this provision can only take place with transactions which are closed before the end of this calendar year.

Mr. Mylod saw acquisition of Beverly Hills as the ideal way for MNC to expand its franchise into California.

FSLIC received two bids for Beverly Hills, one from MNC and another from Franklin Savings. MNC's initial bid for the acquisition of Beverly Hills did not include any specific provisions for tax sharing.[8] Negotiations on the structuring of any potential acquisition began after the initial submission of bids. On November 21, 1988, MNC submitted a revised bid for Beverly Hills which proposed that FSLIC would receive "70% on Built-in Losses on Covered Assets." Preliminary cost analysis done by FSLIC on November 23, 1988 showed that MNC had put forward the most cost-effective proposal.[9]

---

**6.** Defendant disputes that the bid conference failed to generate any "offers." It does not, however, put forward evidence of any offers and disputes only the use of the word "offers." Defendant fails, therefore, to identify a dispute over a material issue of fact.

**7.** Defendant asserts that because these materials described the tax benefits as "presently" available, acquirers were therefore cautioned regarding possible changes in the tax laws. Plaintiff disputes the characterization that the document in some way cautioned potential acquirers regarding potential changes in the tax law. Nothing in the document cited by defendant supports its characterization of the document. In any event, we have held that the deductions were in fact available and that the subsequent agreement did not affirmatively promise their continuation.

**8.** Defendant disputes this statement on the grounds that the lack of inclusion does not imply that Michigan National was uninterested in tax benefits. Plaintiff's proposed finding of fact merely states that no tax benefits were included in plaintiff's initial bid. Defendant does not dispute plaintiff's reading of plaintiff's own initial bid. Defendant fails to identify a disputed issue of material fact.

**9.** Defendant disputes this statement on the grounds that the document relied upon by plaintiff is a draft, and therefore cannot represent a binding view of FSLIC. Defendant does not dispute the authenticity of the document. Defendant's assertion that the draft report may not be used to bind FSLIC fails to dispute that the preliminary analysis was, in fact, done. There-

At that time, tax experts from IRS technical staff, FHLBB and FSLIC staff, and the Treasury Department concluded that the tax benefits included a deduction for covered asset losses.[10] Additionally, tax experts within the Congressional Budget Office, the Comptroller General, and the Joint Committee on Taxation concluded that these tax benefits included a deduction for covered asset losses.[11] MNC's own tax experts and experts from independent entities concluded that the tax benefit available was a deduction for covered asset losses.[12] Mr. Mylod informed MNC's Board of Directors on November 16, 1988 that MNC was pursuing an assisted merger that could "result in significant tax savings and enable [MNC] to profitably penetrate a market [MNC] otherwise could not enter at this time." Minutes of Michigan National Bank Board of Directors Meeting, Nov. 16, 1988.

Following FSLIC's preliminary analysis, Franklin Savings and MNC revised their bids. MNC's bid offered to share tax benefits with FSLIC as follows: "i) none on the negative net worth note; ii) 25% on yield maintenance; iii) 25% on buil[t] in losses on covered assets; iv) 25% on the NOL's; v) 25% of indemnification reimbursements." After the revised bids by Franklin Savings and MNC were submitted, Franklin Savings was the most cost-effective alternative to liquidation.[13]

On December 5, 1988, MNC submitted another revised bid. The tax sharing was outlined as follows:

FSLIC shall receive the following shares of tax benefits on a global basis, as realized:

(a) 0% on the Negative Net Worth Note;

(b) 25% on Yield Maintenance;

(c) 25% on Covered Assets where the sale price is 50% or more of the Covered Asset's book value on the Effective Date, and 50% where such sales price is less than 50% of such Covered Asset's book value on the Effective Date;

(d) 25% of the Net Operating Loss Carry–Over of the Acquired Association; and

(e) 100% on indemnification reimbursements.

On December 27, 1988 MNC once again revised its bid. The tax sharing section was changed to read:

FSLIC to receive a share of all tax benefits actually realized at the consolidated level equal to 25% of global tax benefits until Acquirer has received a return of its aggregate investment plus a compounded return of 20% per annum thereon from Acquirer's 75% share of tax benefits; thereafter, FSLIC to receive 50% of global

---

fore, defendant fails to identify a disputed issue of material fact.

**10.** Defendant contends that neither the IRS staff nor the Treasury Department experts had issued a ruling on this topic. This is non-responsive. Plaintiff does not assert that the IRS or the Treasury Department had issued any such ruling, merely that the staff believed covered asset losses to be available. Defendant fails to identify a genuine dispute about a material issue of fact.

**11.** Defendant disputes this fact on the grounds that those in the Congressional Budget Office, Comptroller General and the Joint Committee on Taxation had no authority to bind the government. Plaintiff does not assert that the staff in these offices had the authority to bind the government, merely that the statements were made. Defendant's response therefore fails to identify a genuine dispute of material fact.

**12.** Defendant disputes this finding, arguing that Mr. Jupiter, FSLIC's principal negotiator, testi-

fied that the benefits were not guaranteed. Additionally, defendant asserts that this statement is one of legal conclusion instead of factual argument. These observations are not responsive to plaintiff's proposed finding. Plaintiff does not assert that the benefits were guaranteed. Nor is this a legal conclusion. Defendant fails to identify a genuine dispute of material fact.

**13.** Defendant asserts that the assisted transactions did not save the government "any money, either directly or indirectly." Plaintiff disputes any suggestion that the government did not receive any economic benefit. Defendant concedes that the assistance agreements relieved pressure on the FSLIC insurance fund, reduced assessments on the already failing thrift industry and deferred the time when Congress had to determine whether to "step in and bail out the industry." Def. Prop. Find. of Fact. ¶ 1. The court thus does not read defendant's proposed finding of fact as denying all economic benefit. Therefore, no dispute exists over a material issue of fact.

tax benefits. If the Negative Net Worth Note is prepaid in whole or part, the tax sharing formula will become 25% (to FSLIC)/75% to the extent of operating losses.

Franklin Savings was eventually eliminated as a bidder by the Office of Regulatory Affairs and FHLBB on December 18, 1988.

As it was negotiating for the acquisition of Beverly Hills, MNC attempted to verify the tax benefits for covered asset losses. In connection with this, MNC retained Barry Taff as outside counsel. Mr. Taff had previously represented other potential acquirers and was familiar with the general nature of FSLIC-assisted deals.[14] During the course of negotiations, Mr. Taff had meetings with representatives from IRS, FSLIC, outside counsel for FSLIC and FHLBB, in an attempt to confirm that the covered asset losses could be taken.[15] Further, MNC consulted Tom Dwyer, an attorney at Arnold & Porter, to get a second opinion about the availability of covered asset losses. Mr. Dwyer spoke with representatives of the IRS, all of whom confirmed that covered asset losses were deductible even though they were reimbursed with FSLIC assistance.[16]

On December 30, 1988, MNC filed a Request for Ruling with the IRS.[17] On July 28, 1989, the IRS issued a Private Letter Ruling which confirmed that the limitations in IRC §§ 382(a) and 383 did not apply to limit utilization by MNC of net operating losses, built-in losses or net capital losses of Beverly Hills, nor was any assistance received from FSLIC includible in the gross income of MNC or Beverly Hills under § 597(a). The Private Letter Ruling went on to state that § 265 did not apply to deny any deduction by MNC, even if the deduction was allocable to payments made by FSLIC. Furthermore, for purposes of § 382, the fair market value of the covered assets as of December 31, 1988 was equal to the book value. Priv. Ltr. Rul. 89–42–093 (July 28, 1989).[18] Ernie Antczak, MNC's Director of Corporate Tax, believed that this Private Letter Ruling eliminated any question as to the availability of covered asset losses.[19]

14. Defendant challenges this statement on the grounds that any inference that Mr. Taff's prior experience with FSLIC-assisted transactions necessarily leads to a conclusion that covered asset losses were available to MNC would be unwarranted. Plaintiff makes no such contention. Plaintiff merely puts forward Mr. Taff's experience as part of his background. Defendant fails to identify a genuine dispute over a material issue of fact.

15. Defendant disputes this finding on the grounds that Mr. Jupiter, FSLIC's principal negotiator, testified that he did not guarantee that the covered asset loss deduction would be available to MNC. Additionally, defendant argues that conversations with IRS officials were not binding on the government. These statements are non-responsive. Plaintiff does not contend that any person promised the continuing availability of covered asset losses, nor that the statements by IRS officials were binding on the government. Defendant fails to identify a genuine dispute over a material issue of fact.

16. Defendant disputes this statement on the grounds that the discussions Mr. Taff and Mr. Dwyer had with these representatives were not binding on the government. Furthermore, it cites testimony by Mr. Jupiter, FSLIC's principal negotiator, to the effect that he did not guarantee a covered asset loss deduction. Whether or not the representations were binding on IRS, FSLIC or FHLBB, defendant does not dispute that the conversations actually took place. There is, therefore, no disputed issue of material fact.

17. Defendant disputes that this Private Letter Ruling was specifically requested on the issue of covered asset losses. Plaintiff makes no such claims, but merely states that it was filed. Defendant's dispute is therefore non-responsive, and fails to identify a genuine dispute on a material issue of fact.

18. Defendant asserts that the Private Letter Ruling did not explicitly find that covered asset loss deductions were available. Plaintiff however is merely recounting the findings of the Private Letter Ruling. Defendant's dispute is therefore non-responsive and fails to identify a genuine dispute over a material issue of fact.

19. Defendant disputes that the Private Letter Ruling actually did ensure the availability of the covered asset losses. It cites other statements by Mr. Antczak in which defendant asserts that Mr. Antczak conceded that the Private Letter Ruling did not specifically address the covered asset loss issue. This does not, however, dispute plaintiff's proposed finding that MNC believed that the Private Letter Ruling had the effect of removing uncertainties. Thus, defendant fails to identify a genuine dispute over a material issue of fact.

On December 30, 1988, FSLIC's Executive Director, Stuart Root, estimated, in a memorandum to FHLBB, the tax benefits to FSLIC would be $122.8 million. According to Mr. Root, an Assistance Agreement with MNC was more favorable than liquidation of Beverly Hills, because "a liquidation [did] not take advantage of the tax benefits." Mr. Root recommended that FHLBB approve MNC's FSLIC-assisted acquisition of Beverly Hills.[20] At this time, MNC believed that the deduction for covered asset losses was available to it. MNC would not have gone forward with the assisted transaction if the tax benefits had not been available.[21]

The parties executed an Assistance Agreement on December 31, 1988. Beverly Hills was converted from a federal savings and loan association to a federal stock savings bank and deemed in danger of default. Under a stock purchase agreement, MNC purchased all of the common stock of the newly converted bank for $52 million. FSLIC issued a ten-year promissory note to Beverly Hills in the amount of $793.9 million, an amount that reflected Beverly Hills' estimated negative net worth. FSLIC agreed to reimburse MNC for 100% of the losses on covered assets. MNC was required, under section 9(f) of the agreement, to share 25% of the tax benefits received due to covered asset losses with FSLIC, until the net investment account reached zero.[22] The preamble of section 9 stated:

> For each taxable year of the NEW ASSOCIATION that closes after the Effective Date, the NEW ASSOCIATION shall credit to the Special Reserve Account, or if this Agreement has terminated, pay to the CORPORATION, an amount equal to the sum of the Indemnification Net Tax Benefits (as defined and calculated in accordance with § 9(c)), the Federal Net Tax Benefits (as defined and calculated in accordance with § 9(d)) and the State Net Tax Benefits (as defined and calculated in accordance with § 9(e)), *if any*, realized by the NEW ASSOCIATION in any year (collectively "Net Tax Benefits").[23]

Pursuant to section 17(c), MNC agreed to file its tax returns in a manner which would "maximize any tax benefits arising from the nature or treatment of assistance" from FSLIC under the Assistance Agreement.

Section 30 of the Assistance Agreement provided under the heading "Continuing Cooperation" that:

> It is the purpose of this Agreement to provide a means by which the failure of the ACQUIRED ASSOCIATION may be prevented, the savers and other creditors of the ACQUIRED ASSOCIATION may be protected against losses, the thrift and financing needs of the communities in which the ACQUIRED ASSOCIATION'S offices are located may be served, the NEW ASSOCIATION and the ACQUIRER may receive the benefits and assume the risks contracted for, and expense to the CORPORATION may be reduced. The parties therefore agree that they shall in good faith, and with their best efforts, cooperate

---

**20.** Defendant disputes that this memorandum proves that covered asset losses were available. Defendant points to testimony of Ms. Hovenden and Mr. Jupiter stating that no promises were made that the covered asset losses would be available in the future. Plaintiff puts forward the proposed finding merely as an estimate of tax benefits by FHLBB at that time. Defendant's statements are non-responsive and fail to identify a genuine dispute over a material issue of fact.

**21.** Defendant disputes the inference that the tax benefits were the sole basis for MNC to engage in the transaction. Plaintiff's proposed finding of fact makes no such claim. Instead, plaintiff merely states that the tax benefits were an integral part of the structure of the assisted transaction. Defendant's dispute is therefore non-responsive and fails to identify a genuine dispute over a material fact.

**22.** The net investment account was calculated to reach zero once MNC received a 20% return on its investment under section 1(kk) of the Assistance Agreement.

**23.** Defendant asserts that the language "if any" was read by Mr. Jupiter, FSLIC's primary negotiator as indicating that it was possible that the covered asset losses would not be available to MNC. Defendant puts forward no evidence that Mr. Jupiter made his understanding known to plaintiff. Furthermore, defendant does not provide any evidence that Mr. Jupiter was correct in believing that the covered asset losses might not be available to MNC. Mr. Jupiter's reading of this section, therefore, is not relevant to whether or not plaintiff was entitled to covered asset loss deductions.

with one another to carry out the purposes of this Agreement as described in this section.

FHLBB issued resolutions certifying that: (a) Beverly Hills was insolvent because its assets were less than its obligations to its creditors and others; (b) severe financial conditions exist which threaten the stability of Beverly Hills and authorization of the proposed conversion is likely to improve its financial condition; (c) the amount of FSLIC assistance would not exceed the amount reasonably necessary to save the cost of liquidating; (d) the conversion and acquisition were necessary to prevent the probable failure of Beverly Hills; (e) the record before FHLBB contained nothing to show, or from which it could have been inferred, that Beverly Hills intentionally placed itself in the position of being insolvent for the purpose of obtaining any tax advantages. These resolutions were expressly integrated into the Assistance Agreement.[24]

Shortly after the execution of the Assistance Agreement, MNC sent representatives to Beverly Hills to aggressively manage the covered assets, to categorize them, and then negotiate transactions that would minimize losses to FSLIC.[25] At the effective date of the Assistance Agreement, the covered assets were estimated at $786.1 million. By December 31, 1989 the covered assets had been reduced to $636.6 million. For every year from 1989 to 1994, when the Assistance Agreement was terminated, FSLIC and its successor agency the Federal Deposit Insurance Corporation ("FDIC") audited MNC to ensure that MNC was maximizing the tax benefits for covered asset losses. The IRS also audited MNC during that same time period and did not challenge its deduction of covered asset losses until after the alleged breach.

Soon after the execution of the Assistance Agreement, both Congress and the press began to inquire into the wisdom of covered asset loss tax deductions. The actions taken by Congress, FSLIC and FHLBB with respect to the treatment of covered asset losses have already been discussed at great length in our previous opinions. See Centex II, 49 Fed.Cl. at 699–707.

The Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA") was passed in 1989, abolishing FSLIC and FHLBB. Their respective functions were taken over by the FDIC and three new agencies, the Resolution Trust Corporation ("RTC"), the Office of Thrift Supervision ("OTS"), and the Federal Housing Finance Board. These agencies actively questioned the treatment of covered asset losses such as that provided under MNC's Assistance Agreement. In August of 1993, the Guarini legislation was signed into law. The Guarini legislation retroactively eliminated the deduction for covered asset losses. See Centex I, 48 Fed.Cl. at 633, First Nationwide, 49 Fed.Cl. at 751.

MNC and Michigan Bank, F.S.B., wholly owned by MNC, were the original plaintiffs in this action. At the outset of this litigation they were wholly owned subsidiaries of National Australia Bank ("NAB").[26] On March 30, 2001, NAB declared a dividend in kind, which resulted in the sale of MNC and Michigan Bank, F.S.B. to ABN AMRO North America, Inc. In the sale, NAB retained the rights of its subsidiaries, Michigan Bank, F.S.B. and MNC, to this litigation. NAB was later substituted as plaintiff under Rule 25(c). Nat'l Australia Bank v. United States, 54 Fed.Cl. 238 (2002).

Plaintiff filed a motion for summary judgment on all four counts of the complaint on

---

**24.** Defendant challenges plaintiff's assertion that FHLBB issued these resolutions and that they were integrated into the Assistance Agreement on the basis that this is an assertion of law, not of fact. Defendant is mistaken, and therefore fails to provide the court with a responsive answer. These facts are deemed admitted. Even if they were conclusions of law, they are correct.

**25.** Defendant disputes the underlying proposed finding of fact on the ground that it does not

prove that covered asset losses were available. It furthermore asserts in response to this finding of fact that plaintiff was aware that the law could change. None of these is responsive to plaintiff's finding of fact. Defendant fails to identify a genuine issue of material fact.

**26.** NAB is a company organized under the laws of the Commonwealth of Australia.

November 18, 2002. In Count I, plaintiff alleges that the government breached the implied duty of good faith and fair dealing implied in the express terms of the Assistance Agreement. In Count II, plaintiff also alleges that the Assistance Agreement included an implied-in-fact contract of good faith and fair dealing. Count III alleges a taking without just compensation in violation of the Fifth Amendment. Count IV alleges that the government's actions resulted in the illegal exaction of money from plaintiff in contravention of the Due Process Clause.

## DISCUSSION

### I. Counts II, III, and IV

At the outset we address Counts II, III, and IV of plaintiff's motion for summary judgment. With respect to Count III, as we have determined in our earlier opinions, a takings claim is "conceptually foreclosed" by the finding of a breach of contract. *Plaintiffs in Winstar–Related Cases v. United States,* 37 Fed.Cl. 174, 187 n. 9; *Centex I,* 48 Fed.Cl. at 633; *Centex II,* 49 Fed.Cl. at 712. Count III of plaintiff's claim is therefore dismissed. Plaintiff's claim under the Due Process clause, Count IV of its complaint, must be dismissed for lack of jurisdiction. *See Centex II,* 49 Fed.Cl. at 712 (citing *N.Y. Power Auth. v. United States,* 42 Fed.Cl. 795, 801 (1999)). Because we see no material difference between Counts I and II, we will not separately discuss the latter. What remains, therefore, is Count I, plaintiff's claim that the government's actions breached the implied duty of good faith and fair dealing arising from the express terms of the Assistance Agreement.

### II. Standing

In its cross-motion for summary judgment, defendant addresses two challenges to plaintiff's standing. Each has been rejected earlier, however. The asserted lack of privity was rejected in *Nat'l Australia Bank,* 54 Fed.Cl. at 239 (2002). We determined that NAB has standing, not as a shareholder, but as a corporation which merely retained a claim brought by, MNC, its wholly-owned subsidiary.

Second, defendant asserts that NAB is barred from continuing this suit under the Anti–Assignment Act, 31 U.S.C. § 3727. In the same order, however, we outlined why the Anti–Assignment Act does not bar NAB from bringing this claim. *Nat'l Australia Bank,* 54 Fed.Cl. at 239–40. Defendant does not raise any new arguments in its cross-motion for summary judgment.

### III. Jurisdiction

Defendant asserts that we do not have jurisdiction because the requirements of 28 U.S.C. § 2502(a) (1994) have not been met. The statute states in relevant part that:

> Citizens or subjects of any foreign government which accords to citizens of the United States the right to prosecute claims against their government in its courts may sue the United States in the United States Court of Federal Claims if the subject matter of the suit is otherwise within such court's jurisdiction.

28 U.S.C. § 2502(a). Plaintiff, in turn, argues that 28 U.S.C. § 2502(a) does not apply to the instant case, because NAB merely brings the cause of its former wholly-owned subsidiary, a United States corporation. It is unnecessary to address that argument, however, because plaintiff has met its burden of proof under the statute.

Plaintiff provided the affidavit of Howard Keith Chillingworth Steele, a partner in an Australian law firm who has practiced in Australia since 1972. He affirms that "citizens of the United States are afforded by Australian law the same right to prosecute claims against the Australian Government in Australia's Courts as are Australian citizens, if the subject matter of the suit is otherwise within an Australian Court's jurisdiction." Steele Aff. ¶¶ 8–9. He illustrated the point with several decisions by Australian courts allowing suits by foreign citizens against the Commonwealth of Australia. *See e.g., Pan American World Airways Inc. v. Commonwealth of Australia,* 7 BPR 15,145, 1977 WL 166260 (1977) (standing of Pan American as a United States corporation not raised in a lease dispute between Pan American and the Commonwealth). The court may rely upon

an affidavit as proof of reciprocal rights of a foreign nation. *Paradissiotis v. United States,* 49 Fed.Cl. 16, 18 (2001); *Egyptian Am. Bank, S.A.E. v. United States,* 13 Cl.Ct. 337, 341 (1987), *aff'd mem.* 861 F.2d 728 (Fed.Cir.1988). Defendant elected not to contest Mr. Steele's affidavit. Plaintiff has therefore met its burden of establishing jurisdiction.

*IV. Liability*

What remains, then, is to determine whether passage of the Guarini legislation constituted a breach of contract on the part of the government. Because we agree with plaintiff that the government has breached the covenant of good faith and fair dealing implied in its express contract with MNC it is unnecessary to address plaintiff's independent argument that the Government breached section 30 of the Assistance Agreement by not using its best efforts to ensure that MNC received the benefits of the bargain.

■ All government contracts contain an implied covenant of good faith and fair dealing. *Centex II,* 49 Fed.Cl. at 708 (citing *Landmark Land Co., Inc. v. United States,* 46 Fed.Cl. 261, 269 (2000); *Allstates Air Cargo, Inc. v. United States,* 42 Fed.Cl. 118, 124 (1998); *Ebasco Servs. Inc. v. United States,* 37 Fed.Cl. 370 (1997)). As discussed in *Centex II,* the government's unique position both as contractor and sovereign may not be used to eradicate the legitimate expectations of its contracting partners.[27] *Cf. Yankee Atomic Elec. Co. v. United States,* 112 F.3d 1569, 1575 (Fed.Cir.1997). Without such a limitation on the government's power, any government contract promises would become illusory. *See Hughes Comm. Galaxy, Inc. v. United States,* 26 Cl.Ct. 123, 140 (1992), *rev'd on other grounds,* 998 F.2d 953 (Fed.Cir.1993).

■ The facts establish that the tax benefits were an important, bargained-for ele-

ment of the Assistance Agreement, which plaintiff correctly understood to be available at the time. In its Request for Proposal, FSLIC touted the benefits of nearly $700 million in net operating losses which could be carried forward. Over the course of negotiations with FSLIC, MNC submitted several revisions to the tax benefits sharing portion of its bid. MNC's Chairman and CEO, Mr. Mylod, informed the Board of Directors that the tax benefits would be a substantial benefit to MNC. The final Assistance Agreement required plaintiff to maximize tax benefits and share these benefits with FSLIC. From the nature of the revisions of plaintiff's bid, the court concludes that the parties thought the tax benefits were important and the division of those benefits was an integral part of the negotiations.[28] Once the ratio for sharing benefits was fixed, neither party could alter it without being liable for a breach.

The government used its power as sovereign to deprive plaintiff of one of its negotiated contract benefits—the tax sharing element of the contract. In doing so, it violated its obligation to act in good faith and fairly towards plaintiff not to use its sovereign powers to deprive plaintiff of the agreed upon benefits. We adopt our earlier holding with respect to the Guarini legislation: "[i]n enacting targeted, retroactive legislation that deprived plaintiff[ ] of the very benefit for which [it] contracted, the United States breached the contract's implied covenant of good faith and fair dealing." *Centex II,* 49 Fed.Cl. at 708.

Defendant argues that the duty of good faith does not attach without an underlying substantive obligation. It argues that our application of good faith and fair dealing is not grounded in any explicitly outlined promise from the contract. The underlying obligation here is the agreed-upon division of tax benefits. The government may not use its sovereign power to deprive plaintiff "of the

---

**27.** Contrary to defendant's argument, plaintiff does not claim that the Assistance Agreement incorporated tax laws and that the Guarini legislation therefore breached the letter of the contract. Instead, plaintiff claims that the targeted nature of the Guarini legislation breached the government's duty of good faith and fair dealing.

**28.** As in *Local America,* that plaintiff may have received other benefits from the transaction is immaterial. Each party to a contract is entitled to rely on the bargained-for benefits of a contract. *Local America Bank,* 52 Fed.Cl. 184, 191 (2002).

fruits actually reduced to possession of contracts lawfully made." *Sinking Funds Cases,* 99 U.S. 700, 720, 25 L.Ed. 496 (1878); *see also, Bowen v. Public Agencies Opposed to Soc. Sec. Entrapment,* 477 U.S. 41, 55, 106 S.Ct. 2390, 91 L.Ed.2d 35 (1986).

We have previous rejected the government's other arguments in the previous tax-benefit cases. *See Centex II,* 49 Fed.Cl. 691, *First Nationwide,* 49 Fed.Cl. 750.

## CONCLUSION

Plaintiff's motion for partial summary judgment as to liability is granted with respect to Count I. Count II is dismissed as moot. Defendant's motion to dismiss Count III and Count IV of plaintiff's complaint is granted. Defendant's cross-motion for summary judgment is denied. The parties are directed to file a joint status report on or before April 18, 2003 proposing further pre-trial proceedings.