**TEMPLE–INLAND, INC. and Subsidiaries, Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

**No. 99–699C.**

United States Court of Federal Claims.

Feb. 25, 2004.

John H. Fleming, Atlanta, GA, for plaintiffs Temple–Inland Inc. and Subsidiaries. With him on the briefs were Daniel R. McKeithen, Jennifer N. Ide, and Shannon L. Kimball, all of counsel.

Brian A. Mizoguchi, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, for the United States. With him on the briefs were Stuart E. Schiffer, Deputy Assistant Attorney General, David M. Cohen, Director, Jeanne E. Davidson, Deputy Director, Scott D. Austin, Glenn I. Chernigoff, Paul G. Freeborne, Jeffrey T. Infelise, and Brian L. Owsley, all of counsel.

## OPINION

BRUGGINK, Judge.

This is one of several cases pending before this court and the Federal Circuit concerning Congress' enactment of Section 13224 of the Omnibus Budget Reconciliation Act of 1993, Pub.L. No. 103–66, 107 Stat. 312, 485 (1993), also known as the "Guarini legislation." *See Nat'l Australia Bank v. United States,* 55 Fed.Cl. 782 (2003); *Local Am. Bank v. United States,* 52 Fed.Cl. 184 (2002); *Coast–to–Coast Fin. Corp. v. United States,* 52 Fed.Cl. 352 (2002); *Centex Corp. v. United States,* 49 Fed.Cl. 691 (2001); *First Heights Bank v. United States,* 51 Fed.Cl. 659 (2001); *First Nationwide Bank v. United States,* 49 Fed. Cl. 750 (2001). These cases arose out of the savings and loan crisis of the 1980s, during

which time the Federal Savings and Loan Insurance Corp. ("FSLIC") offered tax incentives to outside investors to induce them to acquire failing thrifts and restore them to financial viability. The plaintiffs in these cases are institutions that, in 1988, acquired failing thrifts in transactions supervised by FSLIC and the Federal Home Loan Bank Board ("FHLBB"). *See Centex,* 49 Fed.Cl. at 693.

Like the plaintiffs in the other tax benefits cases, Temple–Inland Inc. ("Temple") and its subsidiary, Guaranty Federal Savings Bank ("GFSB"), entered into a contract with FSLIC, approved by FHLBB, to acquire substantially all of the assets and liabilities of three failing thrifts. Plaintiffs allege that as part of that agreement, FSLIC promised, *inter alia,* to reimburse GFSB for losses GFSB incurred in the disposition of "covered assets." In addition, plaintiffs state that FSLIC assured GFSB that it would be able to take a tax deduction for covered asset losses ("CALs") even though losses were reimbursed with tax-free assistance from FSLIC.

Plaintiffs allege that the government breached its implied covenant of good faith and fair dealing in its agreement with plaintiffs by pursuing and then enacting the Guarini legislation, which was targeted at eliminating the CAL deduction. Plaintiffs alternatively allege that the FSLIC tax provisions, which allowed Temple to deduct CALs, were incorporated into Temple's contract with the government, and that the government breached that express agreement by enacting the Guarini legislation. Additionally, plaintiffs argue that defendant breached the express terms of the "best efforts" clause contained in the agreement. Finally, plaintiffs invoke the Fifth Amendment, alleging either a taking of property or a violation of due process rights.

Defendant argues that a deduction for CALs was not actually available to plaintiffs, that plaintiffs assumed the risk of legislative change, and that the language of the parties' express agreement precluded any implied

rights under the contract. Defendant also argues that the Cooperation Clause of the parties' agreement specifically precluded damages such as those sought by plaintiffs here. For reasons set out below, plaintiffs' motion is granted in part and denied in part. Defendant's motion is granted in part and denied in part.

## BACKGROUND

A combination of high interest and inflation in the 1970s and the early 1980s threw the savings and loan industry into a crisis not experienced since the Great Depression. *See United States v. Winstar,* 518 U.S. 839, 844, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996). Faced with having to liquidate a vast number of failing thrifts, the government, acting through the FHLBB and FSLIC, contracted with various financial institutions and private investment groups to merge with or acquire failing thrifts and thereby acquire the assets and assume the liabilities of those thrifts. *See Coast–to–Coast,* 52 Fed.Cl. at 355–56. To enhance FSLIC's ability to find parties willing to enter into such agreements, Congress authorized FSLIC to provide financial assistance to protect the acquirer against losses by reason of the acquisition. The financial incentives offered by FSLIC included payments to reimburse acquirers for capital losses incurred on disposition of covered assets of the acquired institution that had a fair market value less than their book value. *See Centex,* 49 Fed.Cl. at 693. Under FSLIC-specific provisions of the Internal Revenue Code,[1] FSLIC's reimbursement of CALs was not included in the acquirers' gross income. *Id.* Furthermore, the Internal Revenue Code provided a tax deduction for CALs even though those losses were reimbursed with tax-free assistance from the FSLIC. *Id.* It was well understood by tax experts working inside and outside the government that the deduction for CALs was one of the tax benefits available to an acquirer in an FSLIC-assisted thrift acquisition. *Id.* at 693–94.

---

1. *E.g.,* I.R.C. §§ 362, 368, 597 (1988). These provisions did not grant any deductions, but put plaintiffs in a position to take advantage of deductions found elsewhere in the Code at §§ 165, 166, or 593. *See Centex Corp. v. United States,* 48 Fed.Cl. 625, 633–36 (2001).

As part of the Tax Reform Act of 1986,[2] Congress provided that these tax provisions would be repealed as of December 31, 1988, for transactions completed after that date. *Id.* at 694. The December 31, 1988 sunset was prospective only; if an acquirer completed a transaction before that date it would be entitled to the tax benefits for the life of the transaction. The sunset provision therefore provided an incentive for acquirers and FSLIC to complete FSLIC-assisted acquisitions before the end of 1988. Under pressure from the FHLBB, FDIC, and the Treasury Department, Congress extended and modified the FSLIC tax provisions as part of the Technical and Miscellaneous Revenue Act of 1988 ("TAMRA").[3] *See id.* Specifically, section 4012(a) of TAMRA extended the special FSLIC tax provisions that were set to expire on December 31, 1988 for an additional year. For transactions entered into during 1989, however, CALs and other "tax attributes" were reduced by 50% of the amount of FSLIC assistance excluded from gross income.

Temple entered into the thrift industry in 1986 with the acquisition of Kilgore Federal Saving and Loan, considered a small but healthy thrift. In late 1987 or 1988, Temple decided that it was interested in growing its financial services division by expanding its presence in the thrift market. In order to do so, Temple, jointly with Mason Best Co., a Texas-based merchant bank, and Trammell Crow Co., a large real estate company, (collectively, the "Temple Group"), decided it would bid to acquire one or more failing thrifts in an FSLIC-assisted transaction. The members of Temple Group agreed that the transaction would be structured to assure that the new thrift would be a member of the Temple Group for federal income tax purposes. According to the then-managing director of Mason Best, Clarence Mayer, in consultation with the other members of Temple Group, Temple analyzed the size of a tax benefit that Temple could use efficiently, and, based on that calculation, Temple asked FHLBB for a certain size package of thrifts on which to bid.

The thrift crisis of the 1980s was particularly dire in Texas and the Southwest. *See* 1987 FHLBB ANN. REP. at RC00059. In February 1988, the FHLBB introduced the "Southwest Plan" through which it marketed failing thrifts in Texas and across the Southwest. As part of its marketing strategy, FSLIC and FHLBB sent a written "Request for Proposals" ("RFP") to prospective acquirers, including members of the Temple Group. The RFP, in pertinent part, stated:

> In general, the Internal Revenue Code of 1986 presently contains three provisions that provide favorable Federal income tax consequences to a taxpayer that acquires a savings and loan institution in an FSLIC-assisted transaction. First, most FSLIC-assisted acquisitions will qualify as a tax-free reorganization under section 368(a)(1)(G) of the Code. Because of this the tax basis of the assets of the acquired institution will carry over to acquiror and permit the acquiror to recognize a tax loss upon the disposition of an acquired asset which has a tax basis greater than its fair market value. Second, section 382 of the Code generally will permit any net operating loss carryover of the acquired institution to be utilized by the acquiring institution to offset post-acquisition taxable income. Third, section 597 of the Code provides that FSLIC assistance payments received by a savings and loan institution are not includible in income and do not require a reduction in the basis of other assets. These consequences often occur under state income tax laws as well.

> These provisions have the effect of permitting an acquiring institution to realize tax benefits attributable to a particular item even though FSLIC assistance is received with respect to such item. For example, if the acquiror receives coverage for capital losses incurred on the disposition of identified assets of the acquired institution, the acquiror is entitled to deduct such loss for federal income tax purposes, notwithstanding that it is reimbursed for the loss by the

---

2. Pub.L. No. 99–514, 100 Stat. 2085 (1986).

3. Pub.L. No. 100–647, 102 Stat. 3342 (1988).

FSLIC, and that the FSLIC payment is free.

The regulators, in short, were advertising the availability of a "double dip" tax benefit unique to purchasing distressed thrifts—the same benefits the government now contends never existed.

After receiving the RFP, Temple Group was invited to bid on a few packages of thrifts. One package—collectively titled the "Lily Package"—was comprised of three thrifts, Guaranty Federal Savings and Loan Association, Dallas; First Federal Savings and Loan Association, Austin; and Delta Savings Association, Alvin, Texas. In Temple Group's first bid for the Lily package, submitted on July 5, 1988, the Temple Group proposed that Temple would retain all of the tax benefits derived until cumulative amounts equaled $115 million (the amount of capital the Temple Group proposed to contribute to the thrift), and that the Temple Group thereafter would share 50% of the tax benefits with FSLIC. In a July 8 letter, the Temple Group modified its bid. Under the revised terms, the Temple Group offered FSLIC two tax sharing alternatives: either the proposal already offered in the July 5 bid, or an arrangement under which Temple Group would make staged contributions of capital, with a total investment of $145 million (versus the $115 million in the July 5 bid), and FSLIC would share the tax benefits from the start, in exchange for a modification to the warrants issued by FSLIC.

Before entering into any agreement, representatives of the Temple Group conferred with counsel and other advisors about the potential risks and concerns relating to the proposed transaction. In a memo written by Clarence Mayer to other representatives of the Temple Group, Mayer expressed concern over whether "the terms of our contracts can be subsequently changed to our detriment by law changes or rules changes or FHLBB resolutions . . . ." In the same document, Mayer again asked "whether any of our rights under the agreements can be changed in the future to our detriment by a change of law . . . ." Next to this entry was a handwritten note stating, "Change of waiver or forbearance is main issue." In his deposition,

Mayer was asked about this memo and responded that the change of waiver or forbearance issue was not taken as a serious concern by the Temple Group's advisors. Clifford Grum, CEO of Temple, in his deposition testimony, specifically stated that he was reassured by the Temple Groups' tax experts that Temple Group would get the expected tax benefits, including those for covered assets.

On March 14, 1988, James George, of Ernst & Whinney, one of Temple's accountants, faxed to Temple's Tax Director, Chet Winger, a copy of the March 8, 1988 Congressional Record as well as a related BNA article concerning an amendment introduced by Congressman Stark aimed at reducing tax benefits for FSLIC transactions. The Stark amendment proposed to revoke the § 597(a) tax exemption for assistance paid in excess of amounts greater than $200 million, for "amounts received after December 31, 1987 in taxable years ending after such date," and provided that § 382(1)(5) permitting use of an acquired thrift's tax losses would not apply to any ownership change where the change date is after December 31, 1997. The record also reveals that Temple consulted with outside tax counsel, who, at their depositions, acknowledged their awareness of the possibility of Congress enacting certain "retroactive" tax laws. The Stark legislation did not advance, however.

Defendant also points out other materials in the record suggesting that Temple's representatives should have been aware of the possibility of retroactive change. For instance, the government points to a 1991 *Forbes* magazine interview with Temple's CEO, held after the contract was signed, in which he expressed his understanding that "the tax law could be changed," when asked about the pending Guarini legislation. Defendant also points to a pre-contract 1987 memo acknowledging tax projections were based on "current" tax law, and that "future tax regulations . . . could materially affect conclusions . . . ." Similarly, Temple Group's bid on the Lily package was qualified as "assuming present tax laws." Clarence Mayer, Temple's lead negotiator, in fact drafted a request for forbearance protecting Temple

against any successor laws' application to the transaction, but that request was never made.

Richard Kneipper, an attorney who advised the Temple Group, was asked during his deposition whether the Temple Group and its advisors had any concern about the loss of tax benefits. His response was that while the Temple Group's representatives and advisors were aware that the government could alter general tax laws in a way that might affect plaintiffs' ability to take advantage of savings and loans tax provisions, they did not believe the government would uniquely target this specific type of deal. Kneipper further testified that Temple Group and their advisors were satisfied that FSLIC and FHLBB were authorized to make the tax benefit promises offered. According to Kneipper, Temple Group had "received assurances from numerous governmental representatives and their counsel ... that there was authority to grant the tax treatment."

The Temple Group continued to negotiate with FSLIC over the following months. In a letter dated August 3, 1988, Clarence Mayer informed Tom Lykos, Deputy Executive Director of the Southwest Plan, that the Temple Group was again willing to alter its bid. The letter emphasized that one of the issues critical to Temple was the size of the acquisition:

> Size is significant to us so that we may create a savings and loan which (i) has sufficient losses to effectively utilize the ability of Temple Inland to monetize the losses through its consolidated returns, and (ii) will justify the significant and substantial commitment of senior management from Temple Inland, Trammell Crow and Mason Best.

The letter further states that "[b]ecause certain tax rulings are required by Temple–Inland prior to closing, negotiations of final terms must begin on or before August 15, 1988 or we will not be able to proceed...." On August 29, the Temple Group submitted another bid containing two proposals regarding tax benefits: (1) Temple would share 25% of the tax benefits with FSLIC or (2) Temple would retain all tax benefits, but accept a lower level of "yield maintenance" payments from the FSLIC.

On September 17, 1988, the Temple Board of Directors convened a special meeting to consider the acquisition of the Lily Package of thrifts. In advance of the meeting, materials were distributed to the Temple Board members. These materials stated that assistance payments would be tax free under current tax laws. The minutes of the meeting reflect that Clifford Grum, CEO of Temple, and Wayne McDonald, Vice President and CFO, discussed the tax free nature of assistance payments, the concept of covered asset losses, the need for a private letter ruling, and the economic benefits and risks of the proposed transaction. The Temple Board subsequently approved the acquisition.

On September 30, 1988, the FHLBB convened a special meeting to consider the sale of the Lily Package. At the meeting, a FSLIC representative noted that Temple was a "major tax payer," which made "the economics of the tax sharing a major component of their costing." The Lily Package bidding was reviewed, and another FSLIC representative reported that the Temple Group's bid in which it proposed to share 25% of the tax benefits with FSLIC was the least costly alternative to liquidation.

> Looking at the proposals from a flat interest rate scenario, we come up with substantially [the] same conclusions; that is, the liquidation cost of approximately 2,150,000,000, the case 1 that is with the tax sharing of the Mason Best/Tramwell Crow bid being 1,398,000,000, and case 2 with the lower yield subsidy 1,438,000,000, and the GFS & L bid, approximately 1,455,000,000.

> Therefore, from a costing perspective, we were able to conclude that the Mason Best/Tramwell Crow bid was the lower cost proposal, and the principal reason was in the two areas: The fact that more equity was being put in, which translated into a higher estimated value of or share in the company, that is the warrants, and the tax benefits provided to us largely because the Mason Best/Tramwell Crow group could make use of the tax benefits coming from

FSLIC to offset their existing and projected taxable income . . . .

Federal Home Loan Bank Board Meeting, Sept. 30, 1998, at 16. The FHLBB thereafter entered a resolution approving of the Temple Group's acquisition of the Lily Package under the proposal that included the sharing of 25% of the tax benefits with FSLIC. One of the FHLBB resolutions issued in connection with the Lily Package acquisition contained a Tax Certification stating that FHLBB found and certified that each thrift was insolvent for purposes of the Home Owners' Loan Act of 1933, 12 U.S.C. § 1464(d)(6)(A)(i). Pursuant to the resolutions, GFSB was chartered and organized as the surviving thrift of the acquisition.

On September 8, 1988, the Temple Group requested that the IRS issue certain rulings with respect to the tax consequences of the acquisition of the Lily Package. On September 21, 1988, the IRS issued a Private Letter Ruling ("PLR") to Temple, which provided, inter alia, that (1) the acquisitions of the three failing thrifts comprising the Lily Package constituted a reorganization within the meaning of sections 368(a)(1)(G) and 368(a)(3)(D) of the IRC; (2) no gain or loss would be recognized upon the transfer of assets or receipt of assets in exchange for the assumption of liabilities; (3) the tax basis of the assets acquired would be the same as the basis of those assets in the hands of the acquired thrifts immediately before the acquisition; (4) the limitations in IRC sections 382(a) and 383 would not apply to limit utilization by Temple of the net operating losses, built-in losses, or net capital losses of two of the acquired thrifts; (5) payments made by FSLIC pursuant to the Assistance Agreement would constitute money or other property received from FSLIC pursuant section 406(f) of the National Housing Act, and, as such, would not be included or includible in the gross income of Temple or GFSB; and (6) GFSB would be a member of Temple's affiliated group and would be eligible to join any consolidated return filed by Temple. Temple, in short, was cleared to take advantage of the tax benefit provisions.

On September 30, 1988, the same day FHLBB issued a series of resolutions regarding the Temple Group's acquisition of the Lily Package, the parties entered into the Assistance Agreement. Under the Agreement, "Covered Asset Losses" were defined as the amount "by which the Book Value of a Covered Asset exceeds the Net Proceeds Received by [GFSB] upon Liquidation of such Covered Asset," or the amount of any write-down or negative adjustment to the Book Value of a Covered Asset as directed or approved by FSLIC. Pursuant to section 3 of the Agreement, GFSB would debit a "Special Reserve Account I" ("SRA I") in the "amount of covered losses." Section 9 of the Agreement, titled "Tax Benefits," provided that at the end of five years, GFSB would credit or debit the SRA I in accordance with section 9's provisions and share 25% of the Tax Benefits with FSLIC. The Agreement further provided that GFSB would file its tax returns "in such a manner as to maximize any tax benefits arising from the nature or treatment of assistance from [FSLIC] under [the Assistance Agreement]." Finally, section 31 of the Agreement provided that the parties would "in good faith, and with their best efforts, cooperate with one another to carry out the purpose of th[e] Agreement." However, that clause also stated, "Whenever a party is required . . . to use its best efforts, the best efforts requirement shall not be construed to include an obligation to pay money, unless specifically required by the language of this Agreement . . . ."

The history of the Guarini legislation, which was passed in 1993, has already been detailed elsewhere. See Centex, 49 Fed.Cl. at 699–707. Briefly, in 1988 after the closing of the final thrift acquisitions agreement like that at issue here, the press and certain members of Congress began criticizing FHLBB for entering into these deals and for giving very favorable tax treatment to the acquiring institutions. In March of 1989, members of Congress introduced legislation to accelerate the sunset of the tax benefits. The Treasury Department specifically urged prospective repeal of the tax benefits, and the FSLIC formed a "Special Task Force" to review assistance agreements and recommend how to deal with "the problem of covered assets."

In August 1989, Congress enacted the Financial Institutions Reform, Recovery, and Enforcement Act ("FIRREA"), Pub.L. 101–73, 103 Stat 183, which repealed the tax benefit provisions effective for transactions completed on or after May 10, 1989. FIRREA abolished FSLIC and FHLBB, and transferred their functions to the FDIC and three new institutions: the Resolution Trust Corporation ("RTC"), the Office of Thrift Supervision ("OTS"), and the Federal Housing Finance Board ("FHFB"). FIRREA further mandated that the RTC "review all means by which it [could] reduce costs under existing [FSLIC] agreements" and "evaluate costs under existing [FSLIC] agreements" with regard to "capital loss coverage," "tax consequences," and "any other relevant cost consideration." *See* 12 U.S.C. § 1441a(b)(10)(B) (1994). However, FIRREA did not directly impact the tax benefits plaintiffs assert here.

In October of 1989, FDIC staff recommended that the RTC, in its role as receiver of the insolvent thrifts, amend the pre-acquisition receivership tax returns of acquired thrifts in order to reduce the tax benefits associated with the transactions, a view supported by the FDIC's outside counsel, Michael Duhl. *See Centex,* 49 Fed.Cl. at 700–01. The FDIC and RTC continued their review of the 1988 FSLIC-assisted deals into 1990. As part of that review, RTC retained former FHLBB outside counsel, Donald Susswein, to review the treatment of CALs. Although Susswein had previously stated that the tax benefits available to acquirers included the CAL deduction, he now suggested that the deduction might not be available under the Code. Mr. Susswein recommended that "Congress or the IRS might wish to review this area and consider clarifying the law." *See id.* at 701. He noted, however, that a change in the law or clarification could expose the government to damages as a matter of "contract law." Steven Glickstein, an IRS lawyer involved in the 1988 deals, wrote a memo discussing the background of the transactions, in which he stated that "the FSLIC and virtually all of the acquirers were informed that the Service would permit the loss deduction, [even though] private letter rulings were not issued on the point because

of a procedural technicality." *Id.* at 701. However, Mr. Susswein sent the RTC a revised memorandum entitled "Clarifying the Tax Treatment of Losses on Covered Assets," expressing his view, apparently contradicting Glickstein's belief, that "a tax loss does not appear to be allowable" for CALs. *See id.* at 702.

On September 18, 1990, the RTC submitted a report to Congress suggesting that the government would save money "from the reversal of current tax treatment with respect to the deductibility of built-in losses, where the government has compensated acquirers for their economic losses through capital loss payments." *Id.* Susswein's memo, discussed above, was included as an appendix. The Senate Committee on Banking, Housing, and Urban Affairs held a hearing to discuss the RTC Report. At the hearing, RTC Chairman William Seidman testified that denying the CAL deduction could lead to "significant" savings as to the government. *Id.*

In October of 1990, Representative Guarini, one of the legislators involved in reviewing the 1988 FSLIC transactions, asked the FDIC to "provide ... assistance in the form of some kind of briefing or explanation of the double dipping tax issue and the implications of a change in tax treatment." *Id.* The internal FDIC memo addressing Guarini's request noted that the FDIC had "referred Guarini and staff to Treasury on the double-dipping issue," but questioned whether there was a "safe way [for the FDIC] to assist the Congressman on this issue." *Id.*

Later in October of 1990, Guarini introduced a bill denying deductions for covered asset losses reimbursed any time after January 1, 1989. In introducing his bill, Guarini explained:·

> This legislation will reduce the overall costs to the Government of financing the S & L bailout .... If Congress enacts this legislation, the Government will save billions of dollars that are now needlessly being given away for no legitimate purpose.

*Id.* at 703. In December of 1990, attorneys and other officials of the Treasury Department met with officials from the RTC to

discuss FSLIC and the IRS's prior treatment of CALs. *Id.* at 703–04. In March of the following year, Treasury issued its own report to Congress recommending legislation denying a deduction for CALs. In a letter to Congress, Treasury further stated that "Congressional clarification of this issue seems not only desirable but essential .... It is estimated that as much as several billion dollars could be saved if certain deductions are not allowed." *Id.* at 704.

Soon after receiving the Treasury report, Representative Guarini, Senator Roth, and others introduced additional legislation denying a deduction for CALs. This legislation reflected the views of the RTC and Treasury reports and was targeted at only those who had acquired thrifts through FSLIC-assisted transactions. *See id.* at 704–05. This legislation did not pass in 1991 or 1992, although repeal of the CAL deduction was included in the President's budget proposal for the fiscal year 1993. Treasury stated, in its "General Explanation of the President's Budget Proposal Affecting Receipts," that the CAL deduction had created "a perverse incentive [for the acquirers] to hold these assets and to minimize their value when sold" and concluded that denying the deduction would not only eliminate the perverse incentive but also "facilitate measures to renegotiate and reduce the cost of the 1988/89 FSLIC transaction." *Id.* at 705–07.

On January 22, 1992, Representative Dan Rostenkowski, Chairman of the House Ways and Means Committee, announced that the Committee would hold a hearing on various bills relating to the tax treatment of covered asset losses. *Id.* at 706. At the hearing, officials from the RTC and the Department of Treasury appeared in support of the legislation. Terrill A. Hyde, Tax Legislative Counsel for the Treasury Department, as well as three representatives of the RTC, testified at the hearing in favor of the elimination of the CAL deduction.

In February of 1992, the House Ways and Means Committee reported out the Guarini legislation. The Committee Reports stated that the legislation applied specifically to the 1988 FSLIC-assisted transactions and pointed to the RTC and Treasury Reports for

support for their conclusions. Congress then passed the Guarini legislation as part of the Omnibus Budget Reconciliation Act of 1993, which became law on August 10, 1993. As we stated in *Centex*, "The impact of the Guarini legislation was limited to those institutions ... who had contracted for assistance from the FSLIC as part of their acquisition of failing thrifts." *Id.* at 707. The effect of this legislation was to "retroactively eliminate[] the deduction for covered asset losses that had been available under §§ 165, 166, 585, and 593 of the Internal Revenue Code; the legislation did not eliminate the deduction, previously available under those same sections, for any other kind of loss." *Id.*

For tax years 1988 through 1992, Temple filed tax returns taking the position that CALs were deductible, despite the receipt of FSLIC assistance payments with respect to such losses. After the enactment of Guarini, Temple amended its 1991 and 1992 returns in accordance with the law, paying additional tax and interest. After audit by the IRS through the 1992 year, Temple was permitted to take those deductions for "pre-Guarini" (*i.e.*, pre-March 1991) losses.

Temple paid the FDIC the 25% share of tax benefits to which the FDIC was entitled under Section 9 of the Agreement through 1993, and then paid the FDIC for FDIC's further and future share of tax benefits in connection with the GFSB Tax Agreement, executed in connection with a 1995 termination agreement with FDIC, which specifically reserved Temple's right to bring the instant lawsuit.

## DISCUSSION

Plaintiffs argue that the United States breached its implied covenant of good faith and fair dealing in its agreement with Temple when the agencies involved campaigned before Congress to eliminate the very tax benefits just negotiated, and when Congress then enacted the Guarini legislation, which specifically revoked the CAL tax deductions bargained for by the plaintiffs. Plaintiffs make the additional argument that the relevant FSLIC tax provisions were incorporated into the Agreement, and that the government breached its agreement by enacting

legislation that targeted the tax treatment afforded by those incorporated tax provisions. Likewise, plaintiffs assert the agencies' actions breached their express promise to use "best efforts" under section 31 of the Agreement. In the alternative, plaintiffs argue that the Guarini legislation violates either the Takings Clause or Due Process Clause of the Fifth Amendment.

Defendant counters that the former FSLIC tax provisions did not actually allow plaintiffs to deduct losses compensated by FSLIC. Defendant also argues that the government has no contract liability to plaintiffs because plaintiffs assumed the risk of any retroactive tax change, that the express terms of the Agreement preclude any implied contractual obligation on the part of the government, and that the express terms of the Cooperation Clause expressly preclude the damages sought by plaintiffs here. Finally, defendant asserts that the plaintiffs' termination agreement with the FDIC released the United States from all liability.[4]

*I. Implied Covenant of Good Faith and Fair Dealing*

■ On very similar facts, we found a breach of the implied covenant of good faith and fair dealing in six other cases. *Nat'l Australia Bank v. United States,* 55 Fed.Cl. 782 (2003); *Coast–to–Coast Fin. Corp. v. United States,* 52 Fed.Cl. 352 (2002); *Local Am. Bank v. United States,* 52 Fed.Cl. 184 (2002); *Centex,* 49 Fed.Cl. 691; *First Heights Bank v. United States,* 51 Fed.Cl. 659 (2001); *First Nationwide Bank v. United States,* 49 Fed.Cl. 750 (2001). As we stated in *Centex,* "All contracts, including government contracts, contain an implied covenant of good faith and fair dealing." *Centex,* 49 Fed.Cl. at 708. Furthermore, in *Centex* we made it clear that "[i]n a government contract, the implied covenant of good faith and fair dealing requires that the Gov-

ernment not use its unique position as sovereign to target the legitimate expectations of its contracting partners." *Id.* (citing *Yankee Atomic Elec. Co. v. United States,* 112 F.3d 1569, 1575 (Fed.Cir.1997); *Am. Satellite Co. v. United States,* 26 Cl.Ct. 146, 153 (1992), *rev'd on other grounds,* 998 F.2d 953 (Fed. Cir.1993)). Without such a limitation, "every contract promise made by the Government would be illusory." *Id.*

As in *Centex* and its progeny, we hold that the parties correctly understood the law at the time—namely, that the CAL deduction was available as a matter of law.[5] The parties' agreement to divide those tax benefits is also inextricably woven into the Agreement. The Agreement here contained terms requiring FSLIC to reimburse plaintiffs for CALs, requiring plaintiffs to maximize any tax benefits, and requiring plaintiffs to share with the FSLIC any tax benefits derived from the deduction of CALs. Pursuant to the language of the Agreement, Temple was entitled to deduct the losses and keep 75% of the tax savings, while FSLIC took the remaining 25%. This 75% share of the tax savings was a fruit of the contract.

Plaintiffs have also offered extrinsic evidence which further establishes that the government knew of the tax benefits which would be claimed by plaintiffs and understood those benefits to be a crucial part of the deal. The FHLBB's September 30, 1988 meeting, for example, makes this clear:

> [W]e were able to conclude that the Mason Best/Tramwell Crow bid was the lower cost proposal, and the principal reason was in the two areas: The fact that more equity was being put in, which translated into a higher estimated value of or share in the company . . . and *the tax benefits provided to us largely because the Mason Best/Tramwell Crow group could make use of the tax benefits coming from FSLIC*

---

4. We have already considered and reject the defendant's argument that the government was released from liability for breach of contract by release language contained in similar termination agreements. *See Centex,* 48 Fed.Cl. at 628–29; *First Nationwide Bank,* 48 Fed.Cl. 248, 258. Claims against the United States are explicitly reserved by the termination agreement.

5. Defendant's argument to the contrary has already been rejected elsewhere, and we reject it here for reasons previously explained. *See Centex,* 48 Fed.Cl. at 632–37.

*to offset their existing and projected taxable income . . . .*

(Emphasis supplied).

Having agreed to accept only 25% of the benefit from the losses, the government also inevitably made the implicit promise "not [to] exercise its taxing power, in a way targeted at this particular contract and ones similar to it, to eliminate the means by which the benefits were generated and thereby divert to itself one hundred percent of the benefits." *Centex,* 49 Fed.Cl. at 708–09. Without such a promise, "[t]he extensive negotiations concerning the allocation of tax benefits would have led to a useless, unenforceable agreement." *Id.* at 709. Through enactment of the Guarini legislation, however, Congress appropriated 100% of these tax benefits to the United States.

Congress, of course, is free to enact legislation impacting its contractual agreements with private parties when the legislation is "public and general," *Horowitz v. United States,* 267 U.S. 458, 461, 45 S.Ct. 344, 69 L.Ed. 736 (1925), or when doing so is necessary to carry out "essential governmental functions." *Hughes Communications Galaxy v. United States,* 26 Cl.Ct. 123, 140 (1992), *rev'd on other grounds,* 998 F.2d 953 (1993). However, as we stated in *Centex,* the Guarini legislation was neither "public and general" nor necessary to carry out "essential governmental functions." Instead, Guarini was a limited piece of legislation specifi-

cally targeted at "strip[ping] those taxpayers who had entered into contracts with FSLIC and the FHLBB of the fruits of those contracts." *Centex,* 49 Fed.Cl. at 709. It was enacted simply for the purpose of saving the government money. *See Perry v. United States,* 294 U.S. 330, 55 S.Ct. 432, 79 L.Ed. 912 (1935) (striking down, as beyond congressional power, a joint resolution of Congress including language repealing the government's obligation to repay bondholders); *Lynch v. United States,* 292 U.S. 571, 580, 54 S.Ct. 840, 78 L.Ed. 1434 (1934) ("Congress [is] without power to reduce expenditures by abrogating contractual obligations of the United States.").[6] By actively encouraging Congress to enact such legislation, the agencies violated their implied obligation not to interfere with the plaintiffs' legitimate expectations under the contract, and Congress compounded the breach when it enacted the legislation.[7]

It does the United States no credit to argue that it has the right to do what it did in this instance with impunity. The various bailout agreements may, in hindsight, have appeared imprudent. But like any other contracting entity, the United States must suffer the consequences of poor,[8] albeit informed, choices. It cannot avoid them by disingenuously retreating to its role as sovereign. As we stated in *Centex,* "Absent the implied good faith obligation not to target the

---

6. We also note that the present case is distinguishable from *Yankee Atomic Electric Co. v. United States,* 112 F.3d 1569 (1997), which held that the government was not liable for imposing an assessment against a utility company to aid in funding certain clean-up costs stemming from the purchase of enriched uranium at fixed prices. In that case the Federal Circuit held that the legislation at issue was not enacted "for the purpose of retroactively increasing the price of its earlier contracts with Yankee Atomic (i.e., the legislation was passed for the benefit of the Government-as-contractor)," but rather "for the purpose of solving the problem of decontamination and decommissioning of uranium enrichment facilities (i.e., the legislation was passed for the benefit of the public)." *Id.* at 1575. Unlike *Yankee Atomic,* the government here was acting unquestionably "for the benefit of the Government-as-contractor."

7. Defendant argues that there was no fixed sharing ratio to which an implied obligation could

attach. An almost identical argument was raised by defendant in *Coast–to–Coast* and rejected. *See Coast–to–Coast,* 52 Fed.Cl. at 358–59. Section 9 of the Agreement here provided that Temple was to credit 25% of its tax savings attributable to Tax Benefit Items to Special Reserve Account I. The Tax Benefit Items included the CAL deduction, and the tax sharing payments. We believe this arrangement adequately fixes a contractual superstructure to which the implied covenant of good faith and fair dealing attaches. As in *Centex,* without the implied obligation not to take away CAL deductions, "the allocation of the tax benefits would . . . [lead] to a useless, unenforceable agreement." *Centex,* 49 Fed.Cl. at 709. The negotiations leading up to the Agreement, as well as FHLBB's adoption of the proposal at the September 30, 1988 meeting, makes it clear the agency understood that tax benefits were key.

8. The United States certainly obtained, however, substantial benefits from these agreements.

deduction for elimination and, thereby, target one of the benefits plaintiffs received because of the contract, the contract's terms no longer hold together." *Centex,* 49 Fed.Cl. at 709. We reaffirm that holding here, and find defendant's argument without merit.[9]

## II. Assumption of Risk

Defendant argues that there are factual differences between this case and the other Guarini tax benefits cases addressed by this court which require us to reject plaintiffs' breach of the covenant of good faith and fair dealing claim. Defendant contends that the present case is unique for two basic reasons: (1) evidence establishes that plaintiffs were aware of the possibility that the government might enact a retroactive change in the tax laws, and thus assumed the risk of such change; and (2) the express terms of the agreement precluded any implied covenant of good faith. We disagree.

Defendant points to *Seaboard Lumber Co. v. United States,* 308 F.3d 1283 (Fed. Cir.2002), in support of the argument that plaintiffs assumed the risk of regulatory change. In *Seaboard,* the court stated, "Seaboard must show that the non-occurrence of a slump in the timber market was a basic assumption of the ... contract. 'If [the risk] was foreseeable there should have been a provision for it in the contract, and the absence of such a provision gives rise to the inference that the risk was assumed.'" *Id.* at 1295 (quoting *United States v. Winstar Corp.,* 518 U.S. 839, 905, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996)). The government argues that there are genuine issues of material fact concerning whether the risk of targeted retroactive legislative change was foreseeable, thus potentially shifting to plaintiffs such risk.

In advancing this argument, defendant points to the March 14, 1988 fax sent by James George, one of Temple's accountants, to Chet Winger, Temple's Tax Director, containing a copy of the March 8, 1988 Congressional Record, and a related BNA article,

discussing the Stark amendment, which had been introduced to reduce tax benefits for FSLIC assisted transactions. This amendment would have cut off the § 597(a) tax exemption when assistance paid exceeded $200 million, for "amounts received after December 31, 1987 in taxable years ending after such date," and provided that § 382(1)(5) permitting use of an acquired thrift's tax losses would not apply to any ownership change where the change date is after December 31, 1987. Defendant contends that this proposed legislation was targeted to apply to existing FSLIC-assisted transactions and would apply retroactively to exclude tax benefits for assistance received after December 1987. Defendant also alleges that the Temple Group's tax counsel knew of the risk of regulatory change, and that Temple Group acknowledged the uncertainty in the tax law and the potential for change. Defendant points to pre-agreement memos circulated among Temple Group's representatives which all stated that tax projections were based on current tax law, and acknowledging that tax changes in the future may effect tax savings.

The March 1988 fax sent to Chet Winger is irrelevant as to whether Temple assumed such a risk. The Stark bill did not become legislation. Quite the contrary. In the same month, officials of the FHLBB were on Capital Hill urging Congress to extend the FSLIC-specific tax provisions beyond their scheduled sunset of December 31, 1988. *See Centex,* 49 Fed.Cl. at 694. That effort was ultimately successful. Meanwhile, the Southwest Plan was initiated and marketed, at least partially, on the continued and extended availability of sharing tax benefits. The BNA article contains no reference to any proposed effective date of the Stark bill. Instead, the article states that "[t]he bank board and the thrift industry are seeking legislation to retain the tax exempt status of FSLIC assistance beyond Dec. 31, 1988 ...." Rather than putting plaintiffs on notice of the future enactment of the Guarini legis-

---

9. Defendant also argues that tax benefits were not essential to the deal here. We have rejected that argument elsewhere and reject it here. *Local Am. Bank,* 52 Fed.Cl. at 189–90 ("The fact

that there may have been other benefits to [plaintiffs] is immaterial. Each party is entitled to rely on all components of the deal it negotiated.").

lation, the BNA article provided a description of the current tax treatment afforded acquirers of troubled thrifts and the ongoing efforts to preserve those benefits. Given this context, there is no basis for finding any assumption of risk on the part of Temple, nor any disclaimer of the government's obligation of good faith.

■ The defendant also argues that Temple knew how to seek contractual protection, indemnification, or a private letter ruling protecting it against changes in the law, but failed to do so, and thus assumed the risk of any such change. Temple did, however, obtain a ruling from the IRS that put Temple in a position to benefit from the CAL deduction marketed by FSLIC. Furthermore, we previously rejected the argument that the lack of an explicit indemnity against targeted retroactive legislation precludes a claim such as Temple's. In *Local America* we held:

> [t]he fact that there is no indemnification clause requiring the government to indemnify Local for any change in the IRC retracting the benefits in question is also immaterial.... If the court is correct that the parties contracted for a division of tax benefits, and those benefits were improperly eliminated, then there is an independent breach of the duty of good faith and fair dealing. The indemnification clause would be both superfluous and somewhat ironic if intended for these circumstances as opposed to a failure due to a general change in the tax laws, for example.

*Local Am. Bank*, 52 Fed.Cl. at 190. For the same reason, we believe the lack of an indemnification clause here is irrelevant as to plaintiffs' claim. Indeed, we do not believe Congress would have been bound by an IRS letter ruling, nor presumably, would defendant's argument be any different if the Guarini legislation had voided contractual risk-shifting clauses.

We agree with plaintiffs that they need not have specifically allocated to defendant the risk that Congress might enact targeted, retroactive legislation. Much of the evidence defendant relies on suggests an awareness

by plaintiffs' negotiators that the tax laws might change before contract consummation, or that generally applicable tax laws might change in a way after consummation as to make the benefits less desirable. These possibilities we view as irrelevant. Certainly, if Congress had enacted a public and general change in the tax law, plaintiffs would have no claim for damages. However, "[c]ontract law does not require government contractors to anticipate blatantly targeted legislation." *Centex*, 49 Fed.Cl. at 711.

As we have stated before, "When the government enters into a contract, 'it impliedly promises to act in good faith.'" *Id.* We cannot envision a scenario in which such an obligation is waived by anything other than the express terms of the agreement. Indeed, even where the express terms of an agreement allow one party "sole discretion" to institute "retroactive reduction or elimination of a central compensatory element of the contract," that power is still limited by an obligation not to wield such authority without reasonable justification. *Tymshare, Inc. v. Covell*, 727 F.2d 1145, 1154 (D.C.Cir.1984) (Scalia, J.). Here, not only does the contract lack any express provision granting the government the right to retroactively eliminate the bargained-for fruits of the agreement, defendant has offered no legitimate justification for having done so.[10] We hold that plaintiffs had no obligation to contractually anticipate a breach of the implied covenant of good faith and fair dealing such as that at issue here. On the contrary, if the government had wished to retain the broad authority to retroactively reduce or eliminate the bargained-for fruits of the agreement in a select, targeted manner, it was defendant's responsibility to spell out such power in the express terms of the agreement.

■ We turn now to the express terms of the agreement in order to determine if there is any merit in defendant's second argument that the express terms preclude the implied covenant of good faith. Defendant argues that the express terms merely provide an

---

10. In any event, the notion that any party should protect itself from breaches of the implied covenant of good faith and fair dealing by requiring a risk shifting provision in an agreement is absurd on its face.

accounting mechanism that could, in part, relate to tax benefits, "if any," but did not promise the availability of a deduction for CALs reimbursed by FSLIC. Additionally, defendant argues that the express terms of the agreement provide a limited, express remedy in the event a tax deduction is not allowed, precluding the damages sought by plaintiffs here. However, the terms of the Agreement here are in material parity with the terms of the agreements at issue in the other similar tax benefits cases. The parties here undertook materially the same duties here as did the parties in those other cases. *See Centex,* 49 Fed.Cl. at 697–98; *First Nationwide,* 49 Fed.Cl. at 752–54; *First Heights,* 51 Fed.Cl. at 661–62; *Local Am.,* 52 Fed.Cl. at 187–89; *Nat'l Australia,* 55 Fed. Cl. at 787–88. In those cases we found that the express terms of the agreements did not exclude the implied covenant of good faith, and we see no reason for finding otherwise here.

 Nor does the last sentence of Section 31, the "best efforts" clause, which states that the best efforts clause will not be "construed to include an obligation to pay money, unless specifically required by the language of this Agreement or to take impractical or unreasonable actions," preclude plaintiffs' claim. This sentence in no way vitiates the government's obligation to act in good faith, nor does it waive Temple's right to monetary damages in the event the government acts in bad faith to thwart the purposes of the Agreement. We read this clause as providing that if a situation arose under the Agreement with reasonable alternative courses of action available to the parties, neither party would be obligated by Section 31 itself to expend extra funds unless otherwise explicitly required to do so by the Agreement. Section 31 therefore does not preclude plaintiffs' claim for damages due to the government's breach of their implied good faith obligation—an obligation imposed on the parties in addition to Section 31.

### III. *Plaintiffs' Remaining Claims*

Plaintiffs remaining claims can be dismissed. Plaintiffs' takings claim and other remaining claims based on breach of the express terms of the Agreement are foreclosed by our finding of a breach of the implied covenant of good faith and fair dealing. *See Centex,* 49 Fed.Cl. at 712–13. Plaintiffs' due process claim is outside the jurisdiction of this court. *Id.* at 712.

### CONCLUSION

Plaintiffs' motion for partial summary judgement is granted in part and denied in part. Defendant's motion for partial summary judgment is granted in part and denied in part as explained herein. On or before March 19, 2004, the parties shall file a joint proposed schedule for resolving remaining issues.