# United States Court of Appeals for the Federal Circuit

05-5072

NATIONAL AUSTRALIA BANK,

Plaintiff-Appellee,

v.

UNITED STATES,

Defendant-Appellant.

Ryan T. Scarborough, of Williams & Connolly LLP, of Washington, DC, argued for plaintiff-appellee. With him on the brief was Paul Martin Wolff.

Scott D. Austin, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellant. With him on the brief were Stuart E. Schiffer, Deputy Assistant Attorney General and David M. Cohen, Director. Of counsel on the brief was Jeanne E. Davidson, Deputy Director. Of counsel was Brian L. Owsley.

Appealed from: United States Court of Federal Claims

Senior Judge Eric G. Bruggink

# United States Court of Appeals for the Federal Circuit

05-5072

NATIONAL AUSTRALIA BANK,

Plaintiff-Appellee,

v.

UNITED STATES,

Defendant-Appellant.

_____

DECIDED:  June 22, 2006

_____

Before GAJARSA, DYK, and PROST, Circuit Judges.

GAJARSA, Circuit Judge.

In this Winstar-related case, the United States appeals a judgment of the Court of Federal Claims granting summary judgment of liability for breach of contract and awarding expectation damages to appellee National Australia Bank ("NAB").  Nat'l Australia Bank v. United States, 55 Fed. Cl. 782 (2003) ("Summary Judgment Decision"); Nat'l Australia Bank v. United States, 63 Fed. Cl. 352 (2004) ("Damages Decision").  The Court of Federal Claims exercised jurisdiction pursuant to the Tucker Act, 28 U.S.C. § 1491(a)(1), and entered final judgment on December 29, 2004.  We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(3).  For the reasons set forth in this

opinion, we hereby affirm in part, reverse in part, and remand the case to the Court of Federal Claims.

## I.    FACTS

This case is another of the many cases arising from the savings and loan crisis of the 1980s.  One of this court's recent <u>Winstar</u> decisions offered a brief summary of the events that precipitated the <u>Winstar</u> litigation:

> In response to the large number of failing savings and loan institutions in the economic conditions of the 1980s, the United States, acting through the Federal Savings and Loan Insurance Corporation (FSLIC) and related regulatory bodies, encouraged solvent banks to infuse capital and management resources into failing thrift institutions.  The government offered various incentives for that purpose, including tax and accounting benefits, regulatory relief and forbearances, and cash payments, as discussed in [<u>United States v. Winstar Corp.</u>, 518 U.S. 839, 847-56 (1996)].

<u>First Nationwide Bank v. United States</u>, 431 F.3d 1342, 1344 (Fed. Cir. 2005).  The FSLIC entered into contracts providing financial incentives and benefits to institutions that acquired failing thrifts.  One such benefit provided for cash reimbursement of the difference between the book value and the sales price of "covered assets" sold off by the financial institution.  "Covered assets" included thrift assets acquired in foreclosure, loans made by the financial institution pursuant to obligations of the acquired thrift, and various other loans and investments made by the financial institution.  A companion provision of the Internal Revenue Code permitted acquiring institutions to exclude from gross income payments received as reimbursement for covered asset losses.  <u>Summary Judgment Decision</u>, 55 Fed. Cl. at 783.  Thus, participants in the FSLIC's program received both cash payments and significant tax benefits.

NAB[1] entered into an "Assistance Agreement" with FSLIC in connection with NAB's acquisition of a failing thrift, Beverly Hills Savings & Loan, on December 31, 1988. The Assistance Agreement provided for, among other things, "tax-sharing" between NAB and FSLIC, such that NAB was required to share with FSLIC a percentage of the tax benefits received for covered asset losses. Summary Judgment Decision, 55 Fed. Cl. at 787. The exact percentage to be shared is in dispute. As of the date the Assistance Agreement was executed, Beverly Hills' covered assets were estimated at $786.1 million—that is, a substantial amount of potential tax benefits. NAB began to "aggressively manage the covered assets, to categorize them, and then negotiate transactions that would minimize losses to FSLIC." Id. at 788. Each year, FSLIC and its successor entity FDIC "audited [NAB] to ensure that [NAB] was maximizing the tax benefits for covered asset losses." Id.

Shortly after the Assistance Agreement was executed, "Congress and the press began to inquire into the wisdom of the covered asset loss tax deductions." Id. In 1993, Congress enacted the so-called Guarini legislation, Pub. L. 103-66, § 13224, 107 Stat. 312, 485 (1993), which eliminated the deduction for covered asset losses. Id.; see also Centex Corp. v. United States, 395 F.3d 1283, 1289 (Fed. Cir. 2005). Shortly thereafter, on September 29, 1994, the parties entered into a new agreement (the "Termination Agreement") terminating the Assistance Agreement, settling "certain disputes under" that agreement, and expressly reserving NAB's right to file a claim for damages arising out of the Guarini legislation. Damages Decision, 63 Fed. Cl. at 355.

---

[1] The contracting party was actually Michigan National Corporation, which was subsequently acquired by NAB. In the interest of simplicity, we will refer to Michigan National as NAB in this opinion.

This action, and hundreds of others like it, followed, as financial institutions which had acquired failing thrifts to reap the now-revoked tax benefits sought damages from the government for breach of contract.

The Court of Federal Claims granted NAB's motion for partial summary judgment as to Count I of its complaint, which alleged breach of the implied covenant of good faith and fair dealing that attends all government contracts. Summary Judgment Decision, 55 Fed. Cl. at 790-91. The trial court concluded that both the government and NAB "thought the tax benefits were important and the division of those benefits was an integral part of the negotiations," such that "neither party could alter [the tax-sharing arrangement] without being liable for a breach." Id. at 790. Therefore, by using "its power as sovereign to deprive plaintiff of one of its negotiated contract benefits," the United States "violated its obligation to act in good faith and fairly towards plaintiff not to use its sovereign powers to deprive plaintiff of the agreed upon benefits." Id. The trial court then granted NAB's motion for summary judgment as to damages, concluding that NAB had borne its burden of demonstrating its expectancy damages with reasonable certainty, and construing the applicable contracts to impose a sharing ratio of 75/25 on all tax benefits arising from covered asset losses, such that NAB received 75% of such benefits while the FSLIC received the remaining 25%. Damages Decision, 63 Fed. Cl. at 362-63.

We review both the Court of Federal Claims' grant of summary judgment and all questions of law de novo. Cienega Gardens v. United States, 194 F.3d 1231, 1238 (Fed. Cir. 1998).

## II.    DISCUSSION

On appeal, the government alleges that the Court of Federal Claims erred in four respects.  First, it argues that the trial court incorrectly held that the United States was liable for any of the damages sought by NAB for breach of contract.  Second, it claims that, assuming that liability was correctly imposed, NAB nevertheless failed to prove its expectation damages with "reasonable certainty."  Third, the government argues that, if expectation damages were properly awarded, the trial court erred in its calculation of the quantum of damages owed to NAB.  Finally, the government argues that if the contracts with NAB cannot be construed to favor the government's position on their face, then either the Assistance Agreement or the Termination Agreement, or both, should be reformed to reflect the parties' true agreement as to the correct ratio applicable to the calculation of NAB's damages claims.

### A.    Liability

The government withdrew its challenge to the trial court's determination of liability shortly before oral argument in this case, conceding that such a challenge was untenable in view of this court's decisions in Centex Corp v. United States, 395 F.3d 1283 (Fed. Cir. 2005), and First Nationwide Bank v. United States, 431 F.3d 1342 (Fed. Cir. 2005), both of which found the government liable in circumstances indistinguishable from those presented here.  We therefore affirm the Court of Federal Claims' determination of liability.

### B.    Expectation Damages and "Reasonable Certainty"

The trial court granted NAB's motion for summary judgment on the issue of damages, awarding NAB $27,101,530 in damages, plus costs.  Damages Decision, 63

Fed. Cl. at 363. The damage figure derived from NAB's assertion that "because of the Guarini legislation, it was not permitted to deduct $103,155,357 in covered-asset losses on its tax returns and, as a result, paid an additional $36,135,373 in taxes it would not have otherwise paid." Id. at 353. The trial court determined that, pursuant to section 9(f) of the Termination Agreement, NAB was entitled to damages in the amount of 75% of the $36,135,373 in tax losses, or $27,101,530. Id. The United States challenges that determination on appeal, arguing that "NAB did not prove its damages with reasonable certainty." It points out that NAB's claimed damages are based on the calculation of covered-asset losses, which are calculated as "the difference between the proceeds received upon disposition or sale of an asset and the tax basis of that asset." Summary Judgment Decision, 63 Fed. Cl. at 354. NAB was unable, however, to provide evidence of its actual tax basis in any of the covered assets; thus, according to the government, NAB cannot establish any covered asset losses, and its damages claims are too speculative to support an award.

It is axiomatic that expectancy damages must be proved with "reasonable certainty." Bluebonnet Sav. Bank v. United States, 266 F.3d 1348, 1355 (Fed. Cir. 2001) ("Expectation damages are recoverable provided they are actually foreseen or reasonably foreseeable, are caused by the breach of the promisor, and are proved with reasonable certainty."). Here, the trial court noted that "taxable gains or losses on covered assets were computed as the difference between the proceeds received upon disposition or sale of an asset and the tax basis of that asset," and calculated damages on that basis. Damages Decision, 63 Fed. Cl. at 354. The government argues that because NAB "did not know the tax basis for any of its covered assets," and instead

"assumed" that aggregate tax basis was equal to aggregate book basis, it failed to prove the amount of its damages with reasonable certainty. The government challenges the trial court's reliance on the assertion of NAB's expert that although NAB could not establish the tax basis for individual covered assets, it could reasonably conclude that the tax basis for all covered assets in the aggregate was "not less than the book basis in such assets." That conclusion, the United States claims, was "an insufficient basis to support the trial court's conclusion concerning the amount of lost deductions," because it could not "compensate[] for [NAB's] inability to . . . compute covered asset losses on an asset by asset basis." The government also argues that the trial court erroneously shifted the burden of proving reasonable certainty to the government, alleging that the trial court's "cursory dismissal" of the government's expert's testimony amounted to "requiring the Government to disprove that [NAB's damages evidence] constituted an acceptable means to document the unknown tax basis of an individual covered asset."

We disagree. Contrary to the government's assertions, the trial court did not "assume" that the tax basis of the covered assets was equal to the book basis. The use of book basis as a proxy for tax basis was simply an estimate based upon substantial evidence, including the analysis and testimony of outside tax experts. For example, the accounting firm then known as Deloitte, Haskins & Sells was hired to review the tax position of the failing thrift in the years preceding its acquisition. Regarding that review, a witness testified that "Based on the analysis that was done post and pre-acquisition . . . the gross book value for book purposes and the tax basis of an asset are the same." Other tax experts testified that they reached the same conclusion. It is clear from the

trial court's opinion that it carefully reviewed the evidence offered by NAB in support of its damage calculations and concluded that while "it is incumbent upon plaintiff to demonstrate that it is more likely than not that . . . it would have been entitled to claim the $103 million in covered asset losses . . . under the standard articulated by defendant, plaintiff has met its burden" of proof. Damages Decision, 63 Fed. Cl. at 358. There is no basis for the government's assertion that the trial court misapplied the burden of proof.

The government's argument is reduced to a broad assertion that damages based on estimates are never sufficient to establish "reasonable certainty." It cites no authority for that position, and we decline to declare such a sweeping rule.[2] In this connection, we note that in contract cases, "where responsibility for damage is clear, it is not essential that the amount thereof be ascertainable with absolute exactness or mathematical precision: It is enough if the evidence adduced is sufficient to enable a court or jury to make a fair and reasonable approximation." Bluebonnet Sav. Bank, 266 F.3d at 1355 (internal quotation omitted). The trial court's grant of summary judgment as to the availability of expectancy damages was correct.

## C.    Quantum of Damages

The Court of Federal Claims concluded that, under the terms of the Assistance Agreement and Termination Agreement, NAB was required to share only 25% of its tax benefits with FSLIC. Damages Decision, 63 Fed. Cl. at 362-63. The government challenges that determination, arguing that "the Termination Agreement provided that tax benefits were to be shared on a 50/50 basis," and that "[t]o the extent there was any

---

[2]    We note, however, that estimates may not be sufficient to establish reasonable certainty in every case.

ambiguity" in the Termination Agreement, "the extrinsic evidence . . . removes any doubt that the parties intended to share the tax benefits on a 50/50 basis." The government's position would reduce NAB's damages award from $27,101,530 to $18,067,687.[3]

It is undisputed that section 9(f) of the Assistance Agreement provided for a 75/25 tax-benefit split for each year in which "the Net Investment Account of the ACQUIRER is greater than zero" and for a 50/50 split for each year in which "the Net Investment Amount [sic] of the ACQUIRER is equal to or less than zero." It is also undisputed that because of a flaw in the definition of "Net Investment Account of the ACQUIRER," the amount in that account was unlikely ever to drop to zero.[4] Id. at 362 n.23. Thus, under the Assistance Agreement, the tax-benefit split would have always been 75/25, because the trigger for changing the ratio to 50/50 would never have occurred.

The government argues that the Termination Agreement altered that result, and that it was the intent of the parties in drafting that agreement to set a fixed 50/50 ratio for sharing benefits accruing after 1994. The relevant provision of that agreement states that if NAB sues for damages arising out of the Guarini legislation, "then the amount of damages or refunds sought in such Claims shall not include the amount that would have accrued to the benefit of the FDIC Manager under the Assistance Agreement or that would accrue to the benefit of the FDIC Manager under this

---

[3] The figure $18,067,687 represents 50% of the claimed tax losses of $36,135,373. The government's brief, for reasons that are not clear, consistently uses $17,054,381 as the correct damages figure.

[4] Neither the briefs nor the Court of Federal Claims' opinion explains the precise nature of the flaw, but the existence of the flaw and its consequences are undisputed.

Agreement." The trial court construed this provision to "unambiguously" incorporate the Assistance Agreement "for the limited purpose of calculating a damage award for plaintiff's Guarini claim," resulting in a 75/25 split. Damages Decision, 63 Fed. Cl. at 362. In reaching that conclusion, the trial court noted that "[r]ead literally, there is nothing" in the Termination Agreement "that establishes [a 50/50] ratio with respect to the current claim." Id. at 362.

The government maintains that the trial court's construction of section 8.4 of the Termination Agreement cannot stand. To construe the provision to incorporate the Assistance Agreement's 75/25 split in all circumstances, the government argues, would effectively read the words "or that would accrue to the benefit of the FDIC Manager under this Agreement" out of the provision entirely. For that language to have meaning, the Termination Agreement itself must somewhere provide for a tax-sharing split with a ratio different than 75/25. The government claims that, read as a whole, the Termination Agreement unambiguously provides for a 50/50 split for all years after 1994. It also argues, in the alternative, that if the agreement is found to be ambiguous, the trial court should have admitted extrinsic evidence of the parties' intent, which would demonstrate that the government's position is correct.

The trial court held that the agreement was not ambiguous, and in one sense we agree: the meaning of § 8.4, at least, is quite clear. It provides that in litigation arising from the Guarini legislation, the damages sought by NAB will not include the shared portion of tax benefits under the Assistance Agreement or the Termination Agreement. The question remains, however, whether any of the damages sought in this case include amounts that would have "accrue[d] to the benefit of the FDIC Manager under"

the Termination Agreement, and if so, at what ratio those benefits were to be shared. The trial court concluded that the 75/25 ratio set forth in the Assistance Agreement was to apply in all circumstances. This was error. Although the Termination Agreement does contemplate use of the Assistance Agreement ratio in some circumstances, it also contemplates the use of a different, unidentified ratio in other circumstances. Intensive scrutiny of the provisions of the Termination Agreement, however, fails to conclusively establish what alternative ratio should be employed, or under what circumstances. The Termination Agreement provides for a 50/50 sharing ratio in several scenarios, but the government is unable to identify any provision of that agreement that requires such a ratio for benefits accruing from the losses at issue in NAB's claim—covered asset losses. It admits that the provision on which it relies most heavily, § 2.5, applies by its terms to net operating loss carryovers and does not "explicitly mention[ ]" covered asset losses. NAB, for its part, eagerly embraces the portion of § 8.4 that incorporates the 75/25 ratio, but offers no plausible construction of the portion that expressly contemplates the use of some other ratio for amounts accruing to the benefit of the government under the Termination Agreement.

In these circumstances, it appears that the Termination Agreement is ambiguous and does not, on its face, support the trial court's conclusion that the 75/25 split applies to all damages accruing to NAB. The Court of Federal Claims' award of damages must therefore be reversed, and the case remanded to that court for consideration of extrinsic evidence relevant to determining the true intentions of the parties in drafting § 8.4, including the question whether any provision of the Termination Agreement can be or should be construed to provide for a ratio of damage sharing other than a 75/25 split.

D.      Reformation

Reformation of a written agreement on the ground of mutual mistake is an extraordinary remedy, and is available only upon presentation of satisfactory proof of four elements:

(1)     the parties to the contract were mistaken in their belief regarding a fact;
(2)     that mistaken belief constituted a basic assumption underlying the contract;
(3)     the mistake had a material effect on the bargain; and
(4)     the contract did not put the risk of the mistake on the party seeking reformation.

Atlas Corp. v. United States, 895 F.2d 745, 750 (Fed. Cir. 1990).[5]  An erroneous mutual belief about the contents of a written agreement is sufficient to constitute a "mistake" for this purpose: reformation is available "'when the parties, having reached an agreement and having attempted to reduce it to writing, fail to express it correctly in the writing.'" Indiana Ins. Co. v. Pana Cmty. Unit Sch. Dist. No. 8, 314 F.3d 895, 903-04 (7th Cir. 2003) (quoting Restatement (Second) of Contracts, § 155, cmt. a (1981)); see also Phillipine Sugar Estates Dev. Co. v. Gov't of Phillipine Islands, 247 U.S. 385, 389 (1918) (noting that "[i]t is well settled that courts of equity will reform a written contract where, owing to mutual mistake, the language used therein did not fully or accurately express the agreement and intention of the parties," and that "[t]he fact that interpretation or construction of a contract presents a question of law and that, therefore, the mistake

---

[5]     Contracts with the United States entered into pursuant to federal law are governed by federal law in most circumstances, except where, for example, "the direct interests and obligations of the United States are not in question."  Smith v. Cent. Arizona Water Conservation Dist., 418 F.3d 1028, 1034 (9th Cir. 2005).  Both contracts here at issue provide that they shall be governed by Michigan law "to the extent that federal law does not control."  We need not decide whether Michigan or federal contract law governs in this instance, because the general principles of contract reformation do not differ materially under the two legal regimes.

was one of law is not a bar to granting relief."). The general rule is that the elements of a claim for reformation must be proved by clear and convincing evidence. See, e.g., Dingeman v. Reffitt, 393 N.W.2d 632, 636 (Mich. App. 1986) (stating that "[t]he burden of proof is upon the party seeking reformation to present clear and convincing evidence that the contract should be reformed in order to carry out the true agreement of the parties"); Phillipine Sugar Estates, 247 U.S. at 391 (stating that reformation will not be granted "unless the proof of mutual mistake be of the clearest and most satisfactory character"); see also 27 Williston on Contracts § 70.54 (4th ed.) (stating that "the preferred way of appraising the quantum of proof" in reformation cases "is to state quite simply that the evidence must be clear and convincing," and citing Phillipine Sugar Estates); Restatement (Second) of Contracts § 155 cmt. c (1981) (noting that the law of contract typically "requires the trier of the facts to be satisfied by 'clear and convincing evidence' before reformation is granted").

We dispense, first, with the government's argument that the Assistance Agreement should be reformed. The trial court considered this question sua sponte and concluded that reformation would be inappropriate because the parties' intentions regarding the distribution of tax benefits received following litigation were accurately captured in the Termination Agreement. In addition, the trial court noted that the government's claim would be barred by the equitable doctrine of laches, because "[t]he parties continued to operate under the formula in the Assistance Agreement even though they recognized the flaw" it contained. Damages Decision, 63 Fed. Cl. at 363 n.27.

We agree that reformation of the Assistance Agreement is inappropriate. As the government concedes in its brief, the flaw in the Assistance Agreement has already been remedied by the parties in the Termination Agreement, which, according to the government's brief, "cured the flaw in the Assistance Agreement concerning the tax benefit sharing formula." Whatever its other ambiguities, the Termination Agreement clearly contemplates the continued use of the known-to-be-flawed Assistance Agreement formula in at least some circumstances. To reform the Assistance Agreement would undermine the parties' clear intent in drafting the Termination Agreement, and would deny NAB the benefit of its bargain. This we decline to do.

The Termination Agreement, however, requires a different result. We have already concluded that the Termination Agreement is ambiguous and that, on remand, the Court of Federal Claims must consider extrinsic evidence to determine the parties' intent in drafting the agreement. Such evidence is always admissible, in any case, to determine the need for reformation of an instrument. See, e.g., Walden v. Skinner, 101 U.S. 577, 583 (1879) (noting that "Courts of equity afford relief in case of mistake of facts, and allow parol evidence to vary and reform written contracts"); Travelers Indem. Co. v. Calvert Fire Ins. Co., 798 F.2d 826, 835 (5th Cir. 1986) (noting that "[p]arol evidence is admissible to prove . . . mutual mistake of fact"); see also Williston on Contracts § 70:135 (4th ed.) ("The right of reformation . . . is necessarily an invasion or limitation on the parol evidence rule."). On remand, the Court of Federal Claims must review all relevant evidence and consider whether the Termination Agreement is suitable for reformation to reflect the parties' intent.

05-5072                                    14

CONCLUSION

We hereby affirm the Court of Federal Claims' grant of NAB's motion for summary judgment on the availability of expectancy damages. We reverse the trial court's grant of summary judgment on the quantum of damages, and remand the action to the Court of Federal Claims for further consideration in accordance with this opinion.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

No costs.