# ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeal of -- ) | |
| ) | |
| Lee's Ford Dock, Inc. ) | ASBCA No. 59041 |
| ) | |
| Under Contract No. DACW62-1-00-0105 ) | |

APPEARANCES FOR THE APPELLANT:        Alan I. Saltman, Esq.
                                      Evangelin L. Nichols, Esq.
                                      Kathleen Y. Hsu, Esq.
                                        Smith, Currie & Hancock LLP
                                        Washington, DC

                                      Karl F. Dix, Jr., Esq.
                                        Smith, Currie & Hancock LLP
                                        Atlanta, GA

APPEARANCES FOR THE GOVERNMENT:       Thomas H. Gourlay, Jr., Esq.
                                        Engineer Chief Trial Attorney
                                      CPT Daniel K. Bilotti, JA
                                        Engineer Trial Attorney
                                        U.S. Army Engineer District, Nashville

## OPINION BY ADMINISTRATIVE JUDGE CLARKE
## ON THE GOVERNMENT'S MOTION FOR SUMMARY JUDGMENT

Lee's Ford Dock, Inc. (LFD), claims damages resulting from the government's lowering the water level in Lake Cumberland for seven years while construction at the Wolf Creek Dam was completed causing financial damage to its marina concession. LFD seeks reformation of its contract and also alleges breach of contract. We have jurisdiction pursuant to the Disputes clause of the lease and the Contract Disputes Act of 1978 (CDA), 41 U.S.C. §§ 7101-7109. *Lee's Ford Dock, Inc.*, ASBCA No. 59041, 14-1 BCA ¶ 35,679 at 174,638. The government has moved for summary judgment on the bases of the lease's exculpatory clause, the sovereign acts doctrine, estoppel and/or unavailability of the relief requested (gov't mot. at 1). We grant summary judgment in favor of the government.

## STATEMENT OF FACTS (SOF) FOR PURPOSES OF THE MOTION

1. Pursuant to 16 U.S.C. § 460d, the government entered into Lease No. DACW62-1-72-16 with LFD for commercial concession purposes at the Wolf Creek Dam-Lake Cumberland project, Kentucky, on 23 July 1971 (mot., ex. 2). The

lease had an effective date of 1 January 1972 and was for a ten-year period, ending 31 December 1981 (*id*.).

2. During the period from 1975 to 1979, the government lowered the level of Lake Cumberland to construct a concrete diaphragm wall to combat the seepage problems that developed in the foundation of the embankment. Due to budget constraints, the seepage cutoff wall did not extend the entire length of the embankment, stopping approximately 1700 feet short of the right abutment. (R4, tab 15 at 2, 23)

3. On 2 March 1981, pursuant to 16 U.S.C. § 460d, the government entered into Lease No. DACW62-1-81-86 with LFD for commercial concession purposes at Wolf Creek (mot., ex. G-7). The lease was for a term of 20 years, beginning 1 April 1981 and ending 31 March 2001.

4. On 29 August 2000, pursuant to 16 U.S.C. § 460d, the government entered into the lease in dispute, Lease No. DACW62-1-00-0105, with LFD for commercial concession purposes at the Wolf Creek Dam-Lake Cumberland project, Kentucky (R4, tab 3).[1] The Lease area, referred to as the "premises" throughout the lease, comprises approximately 166 acres (130 acres of water and 36 acres of land) (*id*. at 1, 22). The Lease was granted for a term of 25 years, effective 1 September 2000 and ending 31 August 2025 (*id*. at 1).

5. Condition 6 of the Lease, "CONDITION OF PREMISES," states in subparagraph a.: "The Lessee acknowledges that it has inspected the premises, knows its condition, and understands that the same is leased without any representations or warranties whatsoever and without obligation on the part of the United [S]tates to make any alterations, repairs, or additions thereto" (R4, tab 3 at 5).

6. Condition 9 of the Lease, "RIGHT TO ENTER AND FLOOD," states:

> The right is reserved to the United States, its officer[s], agents, and employees to enter upon the premises at any time and for any purpose necessary or convenient in connection with Government purposes; to make inspections; to remove timber or other material, except property of the Lessee; to flood the premises; to manipulate the level of the lake or pool in any manner whatsoever; and/or to make any other use of the lands as may be necessary in connection with project purposes, and the Lessee shall have no claim for damages on account

---

[1] Hereinafter references to the "Lease" shall be to the 29 August 2000 Lease.

thereof against the United States or any officer, agent, or employee thereof.

(R4, tab 3 at 5-6) The government refers to this clause as the exculpatory clause.

7. Condition 10 of the Lease, "INDEMNITY," states:

> The United States shall not be responsible for damages to property or injuries to persons which may arise from or be incident to the exercise of the privileges herein granted, or for damages to the property of the Lessee, or for damages to the property or injuries to the person of the Lessee's officers, agents or employees [sic] others who may be on the premises at their invitation or the invitation of any one of them, and the Lessee shall hold the United States harmless from any and all such claims not including damages due to the fault or negligence of the United States or its contractors.

(R4, tab 3 at 6)

8. Condition 32 of the Lease, "DISPUTES CLAUSE," states that except as otherwise provided in the Contract Disputes Act (CDA), all disputes are to be "resolved under this clause and the provisions of the Act." The primary difference between the Lease and the CDA is that the Lease states that the district engineer will render the decision on any claim made by the lessee. (R4, tab 3 at 14-15)

9. On 7 October 2003, the government and LFD signed a Memorandum of Lease indicating that Hamilton Capital, LLC, had purchased all the shares of the issued and outstanding capital stock of LFD from Mr. Anthony G. Karambellas, the prior owner (R4, tab 4). LFD remained the lessee (*id.*).

10. On the same day, the government and LFD entered into the First Supplemental Agreement to the Lease. This agreement provided an option to renew or extend the lease an additional 25 years at the end of the first 25-year term. The term extension was requested by LFD for "loan amortization, capital improvements and development purposes within the...leased area." (R4, tab 5)

11. On 19 January 2007, Brigadier General (BG) Bruce Berwick, Commander of the U.S. Army Corps of Engineers' Great Lakes and Ohio River Division (COE), and Lieutenant Colonel (LTC) Steven Roemhildt, Commander of the Nashville District, signed a Memorandum for Record, Subject: Wolf Creek Dam Interim Risk Reduction Measures (the IRR Memo) (R4, tab 15). The IRR Memo documented the

3

decision by BG Berwick and LTC Roemhildt to "lower the pool to elevation 680 immediately and hold that elevation for an indefinite period, unless and until the Corps determines that a different pool elevation level is more appropriate" (*id*. at 15). The IRR Executive Summary commenced, "I consider Wolf Creek Dam to be in a high risk of dam failure and therefore I am taking necessary emergency measures to reduce imminent risk of human life, health, property, and severe economic loss" (*id*. at 1).

12. The decision to lower the lake was made in response to the following four major reviews, all of which "reviewed the project and provided information relating to risk" (R4, tab 15 at 4):

- a July 2005 Seepage Control Major Rehabilitation Evaluation Report, which approved remedial construction of the Wolf Creek Dam, to include grouting and a cutoff wall (*id*.);

- a Screening Portfolio Risk Assessment (SPRA), conducted in June 2005, which found Wolf Creek Dam to be at high risk and placed it in the Urgent and Compelling (Failure in Progress) category, one of six dams in the country in the category (*id*. at 5);

- an outside, independent Expert Panel for Peer Review of Six Dams (to validate the SPRA), which found the risk of dam failure to be high and recommended immediate operating restrictions in October 2006, and whose draft report released on 21 December 2006, recommended lowering Lake Cumberland to an elevation between 610 and 650 feet or, if not practical, a higher elevation of 680 feet (*id*. at 5-6), and;

- the Risk-Based Evaluation of Potential Operating Restrictions for Lake Cumberland and Center Hill Lake, released in 2006, which classified the dam as high risk and determined that risk was reduced with lower operating pools (*id*. at 6-7).

On 22 January 2007, the COE began to lower the lake water levels in accordance with the IRR Memo (R4, tab 8 at 2).

13. On 12 July 2007, the government and LFD entered into the Third Supplemental Agreement to the Lease (R4, tab 7). This agreement was in response to the decision to lower the water levels while the Corps rehabilitated the dam (*id*.). The agreement provided that any rent payments due under the lease terms would be held in abeyance not to exceed one year beginning 1 July 2007 and ending 30 June 2008 and that rent for the period would be set at $1.00 (*id*. at 2). As part of the Third Supplemental Agreement, LFD and the government stated that they "agree that this

4

Supplemental Agreement in no way affects the Lessor's rights under Condition 9 of said lease, "RIGHT TO ENTER AND FLOOD" (*id.*).

14. On 5 July 2012, LFD and its associated or affiliated entities filed for bankruptcy under Chapter 11 of the Bankruptcy Code in the Eastern District of Kentucky, London Division. These cases were administered jointly under Case No. 12-60818. (Mot., ex. 9)

15. On 18 January 2013, the "Claim Submission by Lee's Ford Dock, Inc. under Lease for Commercial Concession Purposes No. DACW62-1-00-0105" dated 18 January 2013 (the claim) was emailed to LTC DeLapp, the former district engineer (R4, tab 8). The introductory paragraph reads in part:

> As discussed below, Lee's Ford asserts that the very purpose of the Lease contract has been frustrated by the now six-year drawdown of Lake Cumberland caused by the Corps' decision to lower the Lake on January 19, 2007. As a result, Lee's Ford demands that the Lease contract be reformed in one or more of the following ways to compensate Lee's Ford for the damages it has incurred due to the drawdown: (a) rent owed by Lee's Ford to the Corps under the Lease should be fully abated until such time as the abated rent equals at least $4,000,000.00, which is the amount of Lee's Ford's disaster loan debt to the U.S. Small Business Administration ("SBA"); (b) the Corps will pay the SBA the sum of $4,000,000, plus all accrued interest and loan fees, in satisfaction of Lee's Ford's disaster loan debt to neutralize the detrimental effect that the frustrated contract continues to have on Lee's Ford; and/or (c) the Corps will commit to working with the SBA to develop a federal government policy that would allow the SBA to hold the disaster loan debt fully satisfied by offsetting Lee's Ford's damages arising out of its frustrated Lease against its disaster loan debt under the unitary creditor doctrine.

(R4, tab 8 at 1) LFD's president, Mr. James D. Hamilton, certified the claim (*id.* at 8).

16. On 30 July 2013, in its Bankruptcy proceedings, LFD filed a Motion for Authority to Assume Nonresidential Real Property Lease with the Secretary of the Army and to Establish Prompt Cure Procedures Regarding Same (the Motion to Assume) (mot., ex. 10, Internal exhibits to the Motion to Assume not attached). In that motion, LFD provided a cure for its pre-petition arrearage and stated that the Lease was a "fundamental requirement" for its business and that it had "determined in the

exercise of its sound business judgment that assuming the Lease is in the best interests of Lee's Ford Dock and its Estate, as well as the best interests of all of the affiliated Debtors and Estates, all creditors, and parties in interest" (*id.* at 1, 6).

17. On 26 August 2013 the district engineer and the real estate contracting officer jointly issued a contracting officer's final decision denying LFD's claim (R4, tab 2).

18. On 3 September 2013, the bankruptcy court entered its Order Granting Debtor Lee's Ford Dock, Inc.'s Motion for Authority to Assume Nonresidential Real Property Lease with the Secretary of the Army and to Establish Prompt Cure Procedures Regarding Same (mot., ex. 11).

19. LFD filed a notice of appeal and complaint with the Board on 27 November 2013 claiming a total of $5,755,212 (R4, tab 1). The complaint alleged recovery based on the theory of superior knowledge.

20. The Board docketed the appeal as ASBCA No. 59041 on 2 December 2013. The government moved to dismiss, stating, among other contentions, that the complaint raised a new claim for the first time or appeal. We struck the complaint as it related to that theory, but retained jurisdiction of the appeal to allow LFD to "amend its complaint to assert theories supported by the operative facts stated in the claim." 14-1 BCA ¶ 35,679 at 174,642.

21. LFD filed its amended complaint on 26 January 2015, alleging reformation (Counts I and II) and breach of contract (Count III). The government filed its answer to the amended complaint on 22 June 2015.

## DECISION

*Jurisdiction*

We previously held that we had jurisdiction over this appeal. *Lee's Ford Dock,* 14-1 BCA ¶ 35,679 at 174,640. We address jurisdiction again to clarify that we assumed jurisdiction because the claim states a sum certain in the claim's introductory paragraph, subparagraph (b) "the Corps will pay the SBA the sum of $4,000,000, plus all accrued interest and loan fees, in satisfaction of Lee's Ford's disaster loan debt to neutralize the detrimental effect that the frustrated contract continues to have on Lee's Ford" (SOF ¶ 15).[2]

---

[2] We have no jurisdiction over subparagraph (a) that qualifies the amount with "at least" (*Sandoval Plumbing Repair, Inc.*, ASBCA No. 54640, 05-2 BCA

6

*Bankruptcy*

In our previous decision we did not discuss LFD's bankruptcy and the issue of standing and raise it *sua sponte*. Under bankruptcy law, the debtor may assume or reject any executory contract. Rejection relieves the debtor from its obligation to perform. *U.S. Coating Specialties & Supplies, LLC*, ASBCA No. 58245, 15-1 BCA ¶ 35,957 at 175,707. In this appeal the bankruptcy court granted LFD's motion to assume the lease (SOF ¶¶ 16, 18). Therefore, as debtor in possession, LFD retained the power to pursue this claim and therefore has standing. *SWR, Inc.*, ASBCA No. 56708, 12-1 BCA ¶ 34,988 at 171,945 (citing 11 U.S.C. § 1107(a); *In re United Operating, LLC*, 540 F.3d 351, 355 (5ᵗʰ Cir. 2008)) ("As the debtor in possession, SWR retained the power to pursue this claim on behalf of the estate.").

*Legal Standard for Summary Judgment*

We evaluate the government's motion for summary judgment under the well-settled standard that:

> Summary judgment is properly granted only where there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. The moving party bears the burden of establishing the absence of any genuine issue of material fact and all significant doubt over factual issues must be resolved in favor of the party opposing summary judgment.

*Mingus Constructors, Inc. v. United States,* 812 F.2d 1387, 1390 (Fed. Cir. 1987). In the course of the Board's evaluation of a motion for summary judgment, our role is not "to weigh the evidence and determine the truth of the matter, but rather to ascertain whether material facts are disputed and whether there exists any genuine issue for trial." *Holmes & Narver Constructors, Inc.*, ASBCA Nos. 52429, 52551, 02-1 BCA ¶ 31,849 at 157,393. A material fact is one which may make a difference in the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). LFD must assert facts sufficient to show a dispute as to a material fact of an element of its argument for reformation or breach. *New Iraq Ahd Co.*, ASBCA No. 59304, 15-1 BCA ¶ 35,849 at 175,292 (citing Mingus, 812 F.2d at 1390-91) ("To ward off summary judgment, the non-moving party must do more than make mere allegations; it must assert facts sufficient to show a dispute of material fact.").

---

¶ 33,072 at 163,933) or subparagraph (c) that requests injunctive relief (*Lulus Ostrich Ranch*, ASBCA Nos. 59252, 59450, 14-1 BCA ¶ 35,769 at 175,001).

*Counts I & II – Reformation*

In Counts I & II of the amended complaint LFD seeks reformation of Condition 9, RIGHT TO ENTER AND FLOOD, of its lease (SOF ¶ 6). We refer to this provision as "clause 9." The Federal Circuit has provided guidance on the availability of reformation:

> Reformation of a written agreement on the ground of mutual mistake is an extraordinary remedy, and is available only upon presentation of satisfactory proof of four elements:
>
> > (1) the parties to the contract were mistaken in their belief regarding a fact;
> >
> > (2) that mistaken belief constituted a basic assumption underlying the contract;
> >
> > (3) the mistake had a material effect on the bargain; and
> >
> > (4) the contract did not put the risk of the mistake on the party seeking reformation.

*National Australia Bank v. United States*, 452 F.3d 1321, 1329-30 (Fed. Cir. 2006). Proof of the elements required to support reformation must be proven by clear and convincing evidence. *Id.* We follow this guidance in our analysis herein.

We first consider the government's position. The government argues that clause 9 of the lease is clear and unambiguous (mot. at 11-19; SOF ¶ 6). Clause 9 provides that the government has the right "to manipulate the level of the lake or pool in any manner whatsoever" and LFD "shall have no claim for damages on account thereof against the United States or any officer, agent, or employee thereof" (SOF ¶ 6). The government cites a variety of cases including *Elden v. United States*, 617 F.2d 245 (Ct. Cl. 1980), that involve analogous facts in support of the government's assertion. We agree with the government that clause 9, Right to Enter and Flood, is clear and unambiguous. LFD, however, states that the government's interpretation of the Right to Enter and Flood clause is irrelevant because LFD is seeking reformation of clause 9 (app. br. at 20). We agree with LFD that we cannot grant summary judgment on the basis of clause 9 without examining the reformation issue. If we reform clause 9 to modify the language the government relies on, the original language is indeed irrelevant.

8

LFD asserts that there is a dispute over the state of its knowledge about "how the [Wolf Creek] Dam had been reconstructed in the '70's, *i.e.*, that the seepage cutoff wall that was built did not extend across the width of the entire Dam, that prior to 2000 seepage had re-occurred and that the Dam was in dire shape." LFD contends that "[a]t the time it entered into the 2000 Lease, Appellant was unaware of these facts." (App. br. at 13) LFD contends this is a material disputed fact that precludes granting summary judgment (*id.*). For the purpose of this motion, we accept LFD's contention that it was "unaware" of the "dire" condition of the dam when it entered into the 2000 lease as true. Accordingly, this is not a material disputed fact.

At the outset of its argument, LFD partially quotes from *Rainbow Valley Corp.*, ASBCA No. 11691, 68-2 BCA ¶ 7195 at 33,413; a fuller quote is:

> Equity has jurisdiction to reform a written instrument
> where there has been a meeting of the minds and an
> agreement has actually been entered into, but the written
> instrument does not express what was actually intended by
> the parties, due to either (1) mutual mistake or (2) mistake
> by one of the parties accompanied by inequitable conduct
> by the other party, such as, for example, misrepresentation.
> [Citations omitted]

The Board in *Rainbow Valley* goes on to explain, "In order for a misrepresentation to be a basis for equitable relief, it must be a misstatement concerning a material fact made for the purpose of inducing the other party to act and in fact relied on by the other party." *Id.* at 33,414 (citation omitted). In *Rainbow Valley* the government knew that Rainbow Valley was unwilling to renew its lease unless it was protected against lease cancellation without just cause. *Id.* at 33,412. Rainbow Valley was told cancellation could only occur in a national emergency. *Id.* There was mutual agreement on that point. It turned out that the lease was cancelled without cause and without a national emergency. The Board found that Rainbow Valley was induced to enter into the contract based on the misrepresentation and was entitled to reformation. *Id.* at 33,415. It is significant that the government knew of Rainbow Valley's reluctance to enter into the contract without protection from unilateral cancellation – the "knowledge" element of reformation. Next, LFD cites to *Defense Systems Co.*, ASBCA No. 50918, 01-1 BCA ¶ 31,152 at 153,879, to support the proposition, "As both black letter law and this Board indicate, nondisclosure of a fact can be the equivalent of an assertion that is not in accord with the true facts and a basis upon which to reform a contract" (app. br. at 12). In *Defense Systems* the government failed to separately identify Foreign Military Sales missiles as required by regulation. The Board noted:

9

> Where the Government has failed to follow or violated
> regulations prescribed for the benefit of the contractor, as
> in this case, the Federal Circuit and the Court of Claims
> have authorized reformation as a remedy in some
> circumstances. *See, e.g., LaBarge Products, Inc. v. West,*
> 46 F.3d 1547 (Fed. Cir. 1995) (reformation may be
> appropriate where Government has engaged in auctioning
> in violation of FAR prohibition; contractor did not
> establish price was lower than it would have been because
> of violation); *Applied Devices Corp. v. United States,* 591
> F.2d 635, 640-41, 219 Ct. Cl. 109, 119-20 (1979) (holding
> contractor was entitled to reformation of contract's
> cancellation charge term because Government had violated
> regulation in calculating charge); *Beta Systems, Inc. v.
> United States,* 838 F.2d 1179, 1185-86 (Fed. Cir. 1988)
> (reformation appropriate where the Government violated
> regulations in setting economic index incorporated into
> contract, and there appeared to be an intent by both parties
> to enter into a different contract). Underlying these
> decisions is the basic assumption that the original
> agreement or intent of the parties can be established.

*Defense Systems,* 01-1 BCA ¶ 31,152 at 153,879. There is no such violation of a regulation intended to benefit LFD in this case. Likewise, LFD cites to FARNSWORTH ON CONTRACTS § 7.5 at 252 ("If one party is mistaken as to the contents or effect of a writing, and the other is aware of the mistake but does nothing to correct it, the prevailing view is that this nondisclosure amounts to a representation that the writing is as the mistaken party understands it to be.") (app. br. at 12). Again, knowledge on the part of the silent party of the other party's mistake is required for reformation. Throughout its argument LFD ignores the fact that it must establish that it somehow communicated to the government its mistaken belief and reluctance to enter into the lease if it had known of the condition of the dam in order for the government's silence to be a misrepresentation.

LFD proceeds to argue that the government's silence when entering into the 2000 lease on the condition of the Wolf Creek Dam is, "sufficient both independently and collectively to support reformation of the 2000 Lease" (app. br. at 13). On page 16 of its brief LFD sums up its argument, "Appellant is entitled to reformation here due to a mistake by one of the parties (a mistake as to the condition of the Wolf Creek Dam) accompanied by inequitable conduct by the other party, such as for example, misrepresentation." LFD further explains that the inequitable conduct by the government was "misrepresentation by silence." (App. br. at 16) LFD argues we

should reform the contract because the government did not tell it that (in LFD's words) Wolf Creek Dam was in "dire" condition:

> Respondent stood silent about the indicia at the Wolf Creek Dam that a major rehabilitation, in all probability necessitating an extended drawdown of the Lake, was needed. Respondent's failure to apprise Appellant of the dire condition of the Dam – a key instrumentality on which the viability of the Lease and Appellant's marina business was based, constituted a misrepresentation by silence.

(App. br. at 18) LFD fails to explain how the government's duty to disclose the dam's condition to LFD arose. There is no evidence that LFD, in year 2000, ever communicated to the government that it would not enter into the Lease if the dam was not in good condition. There is absolutely no evidence that LFD made the condition of the dam an issue during contract formation. Without government knowledge of LFD's alleged mistake, there can be no "inequitable conduct by the government, such as, for example, misrepresentation" that would merit reformation. LFD overlooks the basic premise of reformation:

> Reformation, however, cannot supply an agreement that the parties never struck or would have struck. The contract can only be reformed to conform to the parties' agreement or intention. The remedy of reformation is a narrow one, bringing a contract into conformity with "the true agreement of the parties on which there was a meeting of the minds." [Citation omitted]

*Defense Systems*, 01-1 BCA ¶ 31,152 at 153,880. There is absolutely no evidence that the government ever "struck or would have struck" an agreement where it assumed the risk if the dam needed repair necessitating lowering of the water in the lake for a substantial period of time. There is no evidence,[3] and it is beyond belief, that the government would have agreed to negate clause 9.

We likewise reject LFD's alternative argument "even assuming that the COE did not knowingly make misrepresentations by its silence in 2000 and 2003, its failure

---

[3] LFD does not allege that it communicated to the government that its decision to enter into the 2000 lease was based on its mistaken belief that the dam was in good condition. If LFD had alleged government knowledge of its mistake, there is no evidence in the record supporting such an allegation. A mere contention standing alone without evidentiary support is not enough to defeat a motion for summary judgment. *New Iraq Ahd*, 15-1 BCA ¶ 35,849 at 175,292.

to take any meaningful corrective action once the information about the uncompleted cutoff wall, the return of seepage problems and the dire condition of the Dam became known, is sufficient to support Appellant's claim for reformation" (app. br. at 21). The events relating to the mitigation of the rent occurred in 2007 (SOF ¶ 13) and had nothing to do with the formation of the contract in 2000 or subsequent contract modifications.[4] In general reformation cases involve a contract formation process of some kind involving mistake. RESTATEMENT (SECOND) OF CONTRACTS § 155 cmt. a (1981) ("The province of reformation is to make a writing express the agreement that the parties intended it should."). LFD's alternative argument fails for two reasons: it involved no formation process and no knowledge on the part of the government. LFD fails to establish that the government had a duty to take the "meaningful corrective action" it desires.

As to Counts I and II, we find no material disputed facts that would cause us to deny the government's motion. LFD failed to establish, or even allege, that during contract formation the government had knowledge of its alleged mistaken belief that the Dam would not need repair and that if it had known about the "dire" condition, it would not have entered into the Lease. Without this knowledge, there is no inequitable conduct and no entitlement to reformation.

*Count III – Breach of Contract*

In Count III, LFD asserts that the government's drawdown of Lake Cumberland was unreasonable in terms of duration and otherwise constituted a breach of contract (app. br. at 22). LFD would have us interpret clause 9, Right to Enter and Flood, to include a time limitation. LFD contends:

> Appellant interprets ¶ 9 as giving Respondent a right to lower the level of the Lake, but only allows Respondent the right to keep it at a level that would substantially affect Appellant's marina operations for a very limited period, *i.e.*, the clause certainly does not give Respondent the right to substantially lower the Lake level and maintain it at that level continuously for a period of seven and a half years to accommodate another major reconstruction of the Wolf Creek Dam.

(App. br. at 27) LFD included a declaration by Mr. James Hamilton, president of LFD, in support of this interpretation, "We thus interpreted paragraph 9 of the 2000 Lease as giving the Corps of Engineers a right to lower the level of the Lake, but only

---

[4] The July 2007 Supplemental Agreement reducing the rent for one year specifically preserved the government's rights under clause 9 (SOF ¶ 13).

allowing it to keep the Lake at a level that would substantially affect our marina operations for a very limited period" (Hamilton dep. ¶ 7).[5] Clause 9 has no time limitation whatsoever on the government's right to lower the level of the lake. The language could not be clearer:

> The right is reserved to the United States, its officer[s], agents, and employees...to manipulate the level of the lake or pool in any manner whatsoever...and the Lessee shall have no claim for damages on account thereof against the United States or any officer, agent, or employee thereof.

(SOF ¶ 6) There is nothing in this language that could reasonably be interpreted to limit the duration of the government's right to "manipulate the level of the lake." Given the clear and unambiguous language of clause 9, Mr. Hamilton's interpretation is simply not within the "zone of reasonableness." *States Roofing Corp. v. Winter*, 587 F.3d 1364, 1369 (Fed. Cir. 2009). The clause clearly places the risk of the damage now complained of on LFD.

As to Count III, clause 9 is clear and unambiguous and does not impose a time limitation on the government's right to manipulate the water level of the lake. Because LFD's interpretation is unreasonable, there is no breach.

*Miscellaneous Arguments*

LFD argues that clause 9 makes the contract illusory and therefore the government's interpretation is unreasonable (app. br. at 28-29). An illusory promise is "[w]ords of promise which by their terms make performance entirely optional with the 'promisor.'" RESTATEMENT (SECOND) OF CONTRACTS § 77 cmt. a (1981). None of the cases cited by LFD apply directly to the circumstances in this case and we do not agree that the government's interpretation of clause 9 is so broad as to "make performance entirely optional." The Lease is not illusory.

LFD makes a contract interpretation argument, "Moreover, in order for Appellant's interpretation to prevail over the government's, it need not be [the] only possible interpretation, or even the best one" (app. br. at 29). LFD skips a step. This statement is true only if there are two reasonable interpretations rendering the language ambiguous. As we have found, LFD's interpretation is not reasonable and clause 9 is not ambiguous.

---

[5] There is no contemporaneous evidence from the year 2000 corroborating Mr. Hamilton's testimony.

*Sovereign Act*

Since we grant summary judgment in favor of the government based on the above, we need not consider the government's sovereign act argument.

## CONCLUSION

Because LFD failed to establish a disputed material fact needed for its reformation and breach arguments to succeed and clause 9 is clear and unambiguous, and the government is entitled to judgement as a matter of law, we grant the government's motion for summary judgment and deny the appeal.

Dated:  7 March 2016

CRAIG S. CLARKE
Administrative Judge
Armed Services Board
of Contract Appeals

I <u>concur</u>

MARK N. STEMPLER
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I <u>concur</u>

RICHARD SHACKLEFORD
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

14

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 59041, Appeal of Lee's Ford Dock, Inc., rendered in conformance with the Board's Charter.

Dated:

JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals

15